Filed 4/17/13  P. v. Bender CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JACORI BENDER,<br><br>        Defendant and Appellant. | A131954<br><br>(San Francisco City & County<br>Super. Ct. No. 212640) |

While conducting a routine patrol in territory claimed by a gang, police officers saw a group of people, including appellant, standing on a basketball court. When someone shouted a warning about the presence of the police, the group scattered and ran. The police pursued them, and one of the officers saw appellant throw a gun into the street. After appellant was arrested, a broken Ecstasy pill was found in his pocket.

Appellant was convicted of a felony count of carrying a loaded firearm in public while an active participant in a street gang, with an enhancement for committing the crime for the benefit of a gang and with the intent to assist, further, or promote criminal conduct by gang members. He was also convicted of possessing a gun after being convicted of a misdemeanor (also with a gang enhancement), and of possessing a controlled substance while armed with a gun. We conclude that the prosecution failed to prove that appellant actively participated in a street gang while carrying the gun. We therefore reverse the felony gun possession conviction, and remand for further proceedings.

1

## FACTS AND PROCEDURAL BACKGROUND

### A. Arrest of Appellant and Companions

On May 28, 2010, at around 10:00 p.m., five plainclothes officers from the San Francisco Police Department conducted a foot patrol through the Oakdale housing complex in the Bayview district of San Francisco. This was a routine patrol; the officers were not responding to a specific crime report.

The officers spotted a group of more than five people on a basketball court at the end of the street, adjacent to the housing complex. The people were not playing basketball. The officers heard voices shouting "Police in the cuts," and understood the term "cuts" to refer to the footpaths running between the buildings in the complex.

As soon as the warning was shouted, the people in the group began running away in different directions, and the officers ran after them. One of the pursuing officers was Luis DeJesus. As DeJesus ran, he soon saw appellant and two other young men emerge from an alley in front of him to the left, roughly 15 feet away. DeJesus knew appellant and his companions, Andrew Whitfield and Tishan Lowe, from prior contacts with them. By the light of his flashlight, DeJesus saw appellant throw a gun into the middle of the nearby street. He also heard Whitfield yell that the police were there. Appellant and his companions continued to run, and DeJesus pulled out his own gun and ordered the youths to stop.

Another officer, John Hart, joined DeJesus in pursuing the young men, but after the gun was thrown, Hart stayed behind because he was concerned about the gun. DeJesus stopped and detained appellant and Lowe, while Hart detained Whitfield. When Hart approached Whitfield, Whitfield put up his hands and said, "Not me."

In all, DeJesus, Hart, and the other officers detained six people on that occasion— appellant, Lowe, Whitfield, Marion Tukes, Keimareea Lake, and Anthony Redwood—all of whom were young adult Black men. All of them were wearing dark clothing, except that Tukes had on a white t-shirt; none of them were wearing red. Hart did not hear them say anything about the Oakdale Mob gang, or see them flash any gang signs, nor did David Johnson, one of the other officers present.

## B. Investigation and Forensic Testing

After appellant was detained, DeJesus returned to where he had first seen appellant, and retrieved the gun, using latex gloves while handling it. The gun proved to be loaded, with one round in the chamber and seven rounds in the magazine. The gun was later identified as one that had been stolen from a woman's car in Fairfield on April 16, 2010.

The officers released Lake and Redwood, but took appellant, Whitfield, Lowe, and Tukes into custody and transported them to the Bayview police station. At the police station, appellant was searched, and the officers found a small baggie of marijuana and a broken pill in his pocket. Based on a field test, the officers suspected that the pill contained the drug popularly known as Ecstasy. Subsequent laboratory analysis, in the form of microcrystalline reagent tests, confirmed that the pill contained 3, 4-Methylenedioxymethamphetamine, abbreviated as MDMA, which the prosecution's criminalist, Marco Romo, explained was "known on the street as Ecstasy."

At the police station, appellant was booked for gun possession, gang membership, and possession of the marijuana and the pill. Whitfield, Lowe, and Tukes were also booked for gun possession and gang membership, but they were later released, and the charges against them were ultimately dropped.

Sergeant Kevin Labanowski of the San Francisco Police Department's Gang Task Force unit interviewed all of the arrestees, including appellant, that evening. Whitfield, Lowe, and Tukes, who were interviewed before appellant, all disclaimed any knowledge of the gun. A recording of the interview with appellant was played for the jury. When Labanowski asked appellant why he had the gun, appellant either responded by denying that he had a gun, or declined to answer. During the interview, Labanowski showed appellant a photograph of the gun that Labanowski had taken in the police station.

No fingerprints were discernible on the gun. Labanowski took DNA samples from all of the young men who were arrested, and another officer swabbed the gun for DNA. All of the young men's DNA was analyzed to see whose DNA was on the gun. The prosecution's forensic serologist, Thomas Fedor, testified that there was DNA from more

3

than one person on the sample taken from the grip of the gun.  Most of it was contributed by one person, the "major contributor."  Appellant's DNA was consistent with that of the major contributor, and there was only a very small chance—"one in 500 sextillion approximately"—that appellant (or a close relative of his) was *not* the person who was the major contributor.  Whitfield, Tukes, and Lowe were all excluded as possible sources of the DNA on the gun.

## C.  Charges Against Appellant

In an amended information filed February 2, 2010 (the information), appellant was charged with seven counts.  Counts 1 and 2 each charged appellant with carrying a loaded firearm on a public street (former Pen. Code, § 12031, subd. (a)(1)[1]).  This crime (loaded gun possession) is normally a misdemeanor, but is punishable as a felony under specified circumstances, including (1) if the firearm is stolen and the defendant knew or had reasonable cause to believe that it was stolen (§ 12031, subd. (a)(2)(B)), or (2) if the defendant is an active participant in a criminal street gang as defined in section 186.22, subdivision (a)[2] (§ 12031, subd. (a)(2)(C)[3]).  Accordingly, in order to prosecute the loaded gun possession as a felony, count 1 of the information charged that appellant "knew and had reasonable cause to believe" the firearm was stolen, and count 2 of the information charged that appellant was an active participant in a criminal street gang.  Both count 1 and count 2 also charged, as the basis for a sentence enhancement under

---

[1]  All further references to statutes are to the Penal Code unless otherwise noted.  Former section 12031 was repealed in 2010, operative January 1, 2012.  (Stats. 2010, ch. 711, § 4; see generally Nonsubstantive Reorganization of Deadly Weapon Statutes (June 2009) 38 Cal. Law Revision Com. Rep. 217.)  All further references to section 12031 and its subdivisions are to the version of the statute that was in effect as of the date of appellant's arrest on May 28, 2010.

[2]  Section 186.22, subdivision (a) makes it a crime to "actively participate[] in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and . . . willfully promote[], further[], or assist[] in any felonious criminal conduct by members of that gang . . . ."  We will refer to this part of the statute as section 186.22(a), or the gang participation statute.

[3]  We will refer to section 12031, subdivision (a)(2)(C) as section 12031(a)(2)(C), or the gang participant gun possession statute.

4

section 186.22, subd. (b)(1)(A),[4] that the gun possession offense was "committed . . . for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further and assist in criminal conduct by gang members."

Count 3 charged appellant with possessing a firearm within 10 years after being convicted of a misdemeanor, under former section 12021, subdivision (c)(1).[5] The predicate misdemeanor was appellant's November 2009 conviction under section 422 for making criminal threats. Count 3, like counts 1 and 2, included a gang enhancement allegation under the gang enhancement statute.

Count 4 charged appellant with receiving or buying stolen property, i.e., the gun he was seen throwing into the street just prior to his arrest. (§ 496, subd. (a).) Count 5 charged appellant with the substantive offense of participation in a criminal street gang in violation of section 186.22(a), the gang participation statute.

Count 6 charged appellant with possession of a firearm while possessing a controlled substance, in violation of Health and Safety Code section 11370.1, subdivision (a), and count 7 charged appellant with possession of a controlled substance, in violation of Health and Safety Code section 11377, subdivision (a). In both of these counts, the information described the controlled substance in question as "3,4 MDMA METHYLENEDIOXYMETHAMPHETAMINE (ECSTASY), an analog of methamphetamine pursuant to California Health and Safety Code Section 11401[, subdivision] (a)." (Original capitalization.)

---

[4] Section 186.22, subdivision (b)(1)(A) provides for a sentence enhancement when a felony is "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members. . . ." We will refer to this subdivision of the statute as section 186.22(b), or the gang enhancement statute.

[5] Former section 12021 was repealed in 2010, operative January 1, 2012; while still in effect, it was amended effective April 4, 2011. (Stats. 2010, ch. 711, § 4; Stats. 2011, ch. 15, § 501.5.) All further references to section 12021 and its subdivisions are to the version of the statute that was in effect as of the date of appellant's arrest on May 28, 2010. We will refer to section 12021, subdivision (c)(1) as section 12021(c)(1).

5

**D.  Testimony of Gang Expert**

At appellant's trial, the prosecution's evidence in support of the gang participation charge and the gang enhancement allegations consisted almost entirely of the testimony of San Francisco Police Inspector Leonard Broberg, who qualified as a gang expert. Broberg explained that he had been familiar with the Oakdale Mob gang since 1996, and was involved in a civil court proceeding leading to the issuance of an injunction against that gang in March 2007.  The injunction named 22 adults as members of the Oakdale Mob, and was later modified to add 6 more.  Appellant was not among those people; the only person arrested with appellant who was listed on the injunction was Lake.

Broberg testified that most people involved in gangs are between their mid-teens and mid- to late twenties.  He testified that the Oakdale Mob is one of six "validated" gangs—that is, gangs that a court has found to exist—in the Bayview-Hunters Point area. After explaining the values and lifestyle of gang members, Broberg indicated that individuals within a gang will often share access to "community guns" that are hidden in the gang's territory and made available to gang members when needed. The Oakdale Mob's territory includes two blocks of Oakdale and two blocks of Palou, bounded on the east by Griffith, on the west by Ingalls, and on the north by Navy Road, as well as a cul-de-sac off Oakdale called Baldwin Court.  This territory includes the location where appellant was arrested.

Broberg opined that as of May 28, 2010, the Oakdale Mob had between 50 and 75 "documented" members, that is, persons who had come to the attention of law enforcement as being members of that gang.  He described the group's hand signs, and identified its rivals and allies.  He opined that the Oakdale Mob engages in a pattern of violent criminal activity that includes narcotics trafficking, robberies, weapons violations, aggravated assaults, and drive-by shootings.

Broberg explained that the police use multiple criteria to determine whether a person is a member of a gang.  The factors considered include: whether the person has admitted gang membership to an official; whether a reliable informant has indicated that the person is a gang member, or an untested informant has so indicated and the

6

information has been corroborated; who the person's associates are; whether the person spends time in the gang's territory; whether the person has been seen in gang clothing, or has gang tattoos or paraphernalia; and how the person has responded during "jailhouse classification," which is a process used by the sheriffs to decide whom an individual can or cannot be housed with in jail.

Broberg related several incidents of gun-related crimes involving known Oakdale Mob gang members, including some in which appellant was present or involved in some way. In one incident, in December 2009, there was a shooting at Skyline College in San Mateo County, during which an Oakdale Mob member named Eric Brewer was wounded. Appellant was detained during the investigation of that incident, along with Brewer and two other Oakdale Mob members, Germane Benjamin and Demaria McGhee. A gun was found in a backpack associated with the group, and Brewer and Benjamin were convicted of weapons possession crimes. Brewer initially denied knowing any of the people he was arrested with, which Broberg testified often occurred with gang members. Brewer ultimately accepted gang conditions as part of his sentence, however, and Benjamin pleaded guilty to a gang charge. In Broberg's opinion, Benjamin was an Oakdale Mob member.

Broberg also testified about another incident involving McGhee, which occurred in San Francisco in April 2008. Broberg was the investigating officer in that case. McGhee and another man came up to a car that was parked in the Oakdale Mob's territory, and robbed the occupants of the car at gunpoint. McGhee, who was identifiable as an Oakdale Mob member by his tattoos, pled guilty to gang charges in connection with that case.

Broberg was the investigating officer in an incident involving Lake, who was named in the gang injunction and arrested along with appellant in the present case. On December 10, 2007, Lake and another person from Oakdale were stopped by local

7

security officers while riding in a car, and a gun was found on Lake's side of the car. Lake pleaded guilty to weapons charges and a gang crime in that case.[6]

Broberg testified that in his opinion, the Oakdale Mob is a violent gang, and appellant is a member of it. Broberg based his opinion about appellant's gang membership in part on his knowledge of appellant and his history; his knowledge of appellant's association with other Oakdale Mob members; and appellant's presence with gang members in the gang's territory, including on occasions when weapons were recovered.

Broberg's opinion about appellant's gang membership was also based on a number of police reports in which appellant was mentioned in association with the Oakdale Mob.[7] The earliest such incident was in November 2008, when appellant was mentioned, along with Lake, Whitfield, and another man named Omar Williams,[8] in a police report about an incident in which security guards reported a shooting in the area of Oakdale and Baldwin. When the police arrived, the guards told them that appellant and the other three men had left the area at the time of the incident. All four men were detained, and officers who searched the area found a number of bullets and a magazine in the area where the shots were reported.

Broberg acknowledged that he would not consider appellant a gang member based on just that one isolated incident; rather, "there needs to be a sustained pattern of behavior" that is observable "over a period of time." However, the fact that shots were

---

[6] Records of the criminal proceedings arising from the foregoing three incidents were introduced as evidence of "predicate crimes," that is, the crimes that may be relied upon, under section 186.22, subdivisions (f) and (j), to establish that a group of people is a criminal street gang within the meaning of section 186.22.

[7] Broberg's testimony about these police reports was admitted as part of the basis for his opinion, and not for the truth of the statements made in the reports.

[8] We note that the last name "Williams" is also spelled "William" in the record provided to us, with no explanation given concerning the spelling discrepancy. Since it appears that all references in the record are to the same person, and for clarity, we have adopted usage of the spelling "Williams" in this opinion.

fired on this prior occasion, in an area that was gang territory and known for a high level of violence, was a significant indicator that it involved gang-related activity.

Another incident involving appellant occurred on August 19, 2009, on Griffith in the Oakdale Mob territory. Appellant was detained on that date, along with Brewer, Whitfield, and Lowe, as well as Randy Tallo and Edgar Wilson. Wilson had a gun, and all of the others in the group were believed by the police to be Oakdale Mob members.

In addition, on September 25, 2009, appellant and Benjamin were arrested for threatening some private security guards who were protecting a piece of property near the Oakdale Mob territory. Broberg was one of the officers who investigated the incident. Appellant was reported to have told the guards he was a "real Oakdale boy," that the guards did not belong in that area, and if they continued "messing with" appellant and other Oakdale Mob members, they could get shot. Benjamin threatened, in appellant's presence, that if the guards said anything about the incident, he would take their heads off. Based on the September 2009 incident, appellant was convicted of a misdemeanor violation of section 422.

At the time of his arrest in September 2009, appellant was wearing a red Mohawk hairdo and red underwear. According to Broberg, the color red was associated with the Oakdale Mob, and other members had also dyed their hair red.

Appellant was interviewed after his September 2009 arrest, and a recording of the interview was played for the jury. During the interview, appellant told police that he had grown up in the Oakdale area, and that although he had left for a while when his mother sent him to foster care to try to keep him out of trouble, he had been "claiming Oakdale" since about 2002. According to Broberg, this was a declaration of membership in the Oakdale Mob, but when asked outright during the interview whether he was with the Oakdale Mob, appellant responded, "Man, that's what you all want to say, I mean." Appellant told the police that if he was jailed with people from Harbor Row or Kirkwood (rival gangs), they would have to fight. Broberg opined that this was another indication that appellant was affiliated with the Oakdale Mob.

9

During the interview, appellant showed the officers his tattoos, and indicated that he intended to get additional tattoos. However, appellant disclaimed any intent to be tattooed with Oakdale Mob symbols, because "That's stupid" and "That's hot." According to Broberg, appellant's *lack* of gang-related tattoos did not mean that he was *not* a gang member; rather, in light of appellant's explanation, it was consistent with a recent trend among gang members, including appellant, who were beginning to realize that having gang tattoos would cause them trouble with the police.

Broberg briefly discussed appellant's arrests in January and February 2010, which arose from his returning to the Oakdale neighborhood in violation of a stay-away order. He then discussed an incident on March 17, 2010, in which appellant was in a car with Tukes (one of his companions at the time of his arrest), Williams, and a man named Kenneth Lieu.[9] On that date, officers responding to a report of shots fired in the Oakdale territory stopped a car that was seen speeding away. Appellant, who was sitting in the front passenger seat, had sustained a gunshot wound to his leg, yet the people in the car did not inform the officers of that fact. Once the officers noticed that appellant was wounded, they summoned an ambulance and had him taken to the hospital. Appellant declined to cooperate in the investigation of the shooting, which Broberg believed reflected the "don't snitch" mentality characteristic of gangs. Broberg opined that Tukes and Williams were Oakdale Mob members, but had no opinion in that regard as to Lieu.

On April 17, 2010, a month after appellant was wounded in the leg, he was riding in a car with an Oakdale Mob member named Jeron Jones when the police received a report that someone in that car had brandished a gun. The police attempted to stop Jones's car, but Jones eluded them, and they were not able to locate the car again. Appellant's presence in the car during this incident reinforced Broberg's belief that appellant was an Oakdale Mob member.

---

[9] As in footnote 8 above, we note another spelling discrepancy in that the last name "Lieu" is also spelled "Liu" in the record provided to us. For the same reasons as those given in footnote 8, we have adopted usage of the spelling "Lieu" in this opinion.

On April 24, 2010, appellant was detained near a location in Oakdale Mob territory where officers were conducting a probation search. Several known Oakdale Mob gang members were also detained along with appellant. During the search, the officers found a cache of hollow point bullets in a crawl space under a building on Oakdale. Broberg testified that gang members often hid guns and bullets in spaces where others could find them if they needed them.

Broberg testified that the incident giving rise to the present case reinforced his belief that appellant was an Oakdale Mob member, because appellant was in the gang's territory late at night, with other gang members, and in possession of a gun. His opinion was also based on appellant's having been seen in the area in the company of Oakdale Mob associates on numerous occasions, as recorded on field identification cards prepared by police to document the activities of people they are monitoring.

Finally, Broberg opined that when appellant possessed the gun that DeJesus saw him throw away on May 28, 2010, he did so to promote, further, and assist in criminal conduct on the part of the Oakdale Mob gang. This opinion was based on appellant's Oakdale Mob membership; his presence in the Oakdale Mob's territory on that occasion; his refusal to cooperate in the investigation when he was shot two months earlier; his past association with Oakdale Mob members who were armed with guns; Broberg's own knowledge that guns were frequently shared; the fact that a warning was given when the police were spotted, and the group of people appellant was with then split up and ran in different directions. Broberg opined that appellant, as a gang member, would use a gun to initiate an action such as committing a crime, taking vengeance, or retaliating against a rival.

Broberg admitted on cross-examination, however, that he had never been told by an Oakdale Mob member or suspected member that appellant had committed any crime in their company, and that he was not aware that appellant had been involved in any robberies, burglaries, narcotics sales, or drive by shootings (except for the shooting in which appellant was the victim). He also acknowledged that no one other than fellow

police officers, and no one in the Oakdale community or the communities associated with rival gangs, had identified appellant to him as a member of the Oakdale Mob.

### E. Defense Case

Appellant's grandmother, Lavahn Cecil Gay; his aunt, Latrice Manuel; and his godmother, Kim Justin, all testified in his defense. The thrust of their testimony was to demonstrate that appellant had childhood, family, and job-related ties both to the Oakdale neighborhood and to other young men from that neighborhood, and thus had ample reasons to be in the area and congregate with those people that did not involve a connection with any gang. Justin also testified that appellant's red Mohawk hairdo was just a style, and had no gang implications, and that his "claiming" Oakdale simply meant that he identified it as his community or where he lived. A representative of a former employer of appellant's corroborated Justin's testimony that appellant worked at a job in the Oakdale area during 2008-2009.

### F. Jury Verdict and Sentence

The jury's verdict was returned on March 14, 2011. The jury convicted appellant on counts 1 through 3 of unlawfully carrying a loaded firearm, and on count 2 of doing so while an active participant in a criminal street gang, but rejected the allegation in count 1 that he knew or had reason to know the gun was stolen. By the same token, the jury acquitted appellant of the receiving stolen property charge pleaded in count 4. The jury found true the gang enhancement allegations on counts 1 through 3. The jury also convicted appellant of possessing a controlled substance while armed with a firearm, as pleaded in count 6. The jury followed the trial court's instruction not to return a verdict on counts 5 and 7 if it convicted appellant on the greater offenses alleged in counts 2 and 6, respectively.

On April 8, 2011, appellant was sentenced to the middle term of two years in state prison on count 2, with a consecutive two years for the gang enhancement, with a three-year sentence on count 6 to be served concurrently with the sentence on count 2. Sentencing on count 3 was stayed pursuant to section 654. Appellant's conviction on count 1 was reduced to a misdemeanor and vacated. Appellant was also ordered to pay

12

restitution fines, as well as a court security fee of $160 under section 1465.8, subdivision (a)(1). This timely appeal ensued.

## DISCUSSION

### A. Sufficiency of Evidence to Support Felony Conviction on Count 2

Count 2 charged appellant with carrying a loaded firearm in public, and alleged that the crime was a felony rather than a misdemeanor, under the gang participant gun possession statute (§ 12031(a)(2)(C)), because when it was committed, appellant was an active participant in a criminal street gang. Appellant does not challenge his underlying conviction for carrying a loaded firearm in public. He argues, however, that the conviction must be reduced to a misdemeanor, because the prosecution did not produce evidence sufficient to establish the additional element that he was an active participant in a criminal street gang, as defined in section 186.22(a), at the time of the crime.

After briefing was complete in this case, our Supreme Court decided *People v. Rodriguez* (2012) 55 Cal.4th 1125 (*Rodriguez*).[10] In *Rodriguez*, a majority of the Supreme Court held that in order to convict a defendant of the crime of active participation in a criminal street gang under section 186.22(a), the prosecution must prove that the defendant promoted, furthered, or assisted felonious criminal conduct by *other members of the gang*, not just the defendant himself. Thus, when a gang member acts alone in committing a crime, he cannot be convicted of violating the gang participation statute. (*Id*. at pp. 1128, 1138-1139.)

Even before it decided *Rodriguez, supra*, 55 Cal.4th 1125, the Supreme Court had already held that the misdemeanor offense of loaded gun possession cannot be elevated to a felony under the gang participant gun possession statute, as the prosecution sought to do in the present case, merely by proving that the defendant is "more than a nominal

---

[10] After the Supreme Court issued its decision in *Rodriguez, supra*, 55 Cal.4th 1125, we requested and received supplemental letter briefs from both parties regarding its effect, if any, on the issues in the present case. In assessing appellant's arguments as to count 2, and also as to the gang enhancement allegations (discussed in the next section, *post*), we have considered the parties' supplemental letter briefs as well as the arguments and authorities presented in their original briefs.

13

member of a criminal street gang." (*People v. Lamas* (2007) 42 Cal.4th 516, 524 (*Lamas*).)  Rather, the prosecution must prove all of the elements of the gang participation statute, "including that defendant willfully promoted, furthered, or assisted felonious conduct by his fellow gang members" that was "*distinct from* the otherwise misdemeanor conduct of carrying a loaded weapon."  (*Ibid.*, original italics.)

Thus, the effect of *Rodriguez, supra*, 55 Cal.4th 1125, is to impose an additional limitation on the reach of the gang participant gun possession statute.  Under *Rodriguez* and *Lamas, supra*, 42 Cal.4th 516, taken together, in order to elevate loaded gun possession to a felony under the gang participant gun possession statute, the prosecution must prove that in connection with the gun possession, felonious conduct "distinct from" the gun possession was committed by gang members "distinct from" the defendant himself.

No such proof was offered in the present case.  Even assuming for the sake of argument that appellant and his companions were members of the Oakdale Mob gang, the prosecution did not offer any evidence that at the time of appellant's arrest, any gang members other than appellant had just committed, were committing, or were about to commit any felonious criminal conduct distinct from the gun possession itself.  Indeed, the record is to the contrary.  The arresting officers testified that their presence on the scene was pursuant to a routine patrol rather than a specific crime report.  The gang members who were arrested along with appellant were not charged with any crimes other than gun possession and gang membership, and were not prosecuted for either of those crimes.  Although appellant had marijuana and Ecstasy in his pocket, there is no indication in the record that his companions possessed any drugs themselves, or even were aware that appellant had them.

Respondent argues that there was sufficient evidence of the requisite felonious conduct based on Broberg's testimony that the gun would be available to other gang members for use in the commission of future felonies, and that by bringing the gun into the gang's territory, appellant was assisting the gang in defending its turf against potential encroachment by rivals.  However, the felonious conduct by other gang members that

14

qualifies an incident of gun possession for punishment as a felony must consist of one or more *specific felonies* occurring in direct conjunction with the gun possession. As the Supreme Court has emphasized in several recent cases, including *Rodriguez*, the gang participation statute requires proof of the defendant's "promotion or furtherance of *specific conduct* of gang members and not inchoate future conduct. . . ." (*Rodriguez*, *supra*, 55 Cal.4th at p. 1137, original italics; see also *Lamas*, *supra*, 42 Cal.4th at p. 526; *People v. Castaneda* (2000) 23 Cal.4th 743, 749.) Thus, appellant's gun possession cannot be punished as a felony solely on the basis of Broberg's opinion testimony regarding how appellant and his companions probably planned to use the gun.

Respondent also argues that the jury could have found specific felonious conduct by the other gang members in the form of a conspiracy between them and appellant to conceal the gun from the police. We are not certain that a conspiracy to conceal the gun is sufficiently distinct from the gun possession itself to pass muster under the analysis of *Lamas*, *supra*, 42 Cal.4th 516. (See *id.* at p. 524 [gang participant gun possession statute "applies only *after* [gang participation statute] has been *completely* satisfied by conduct *distinct from* the otherwise misdemeanor conduct of carrying a loaded weapon" (original italics)]; see also *In re Jorge P.* (2011) 197 Cal.App.4th 628, 636-638 [offense of gun possession by minor, even if treated as felony, was not sufficiently distinct from gun possession itself to justify application of gang participant gun possession statute].) We need not reach this question, however, because in the present case, this theory was not presented to the jury, and in any event is not supported by substantial evidence in the record.

There is uncontroverted evidence that one or more people in or near the group in which appellant was standing shouted a warning about the presence of the police, and that after hearing the warning, the group scattered and attempted to flee. However, there is no evidence as to where the warning shouts originated. Thus, there is no evidence that the person or people who uttered them was even a member of the group appellant was with, much less an Oakdale Mob member or associate.

Nor was there substantial evidence permitting the inference that appellant threw the gun into the street in furtherance of a conspiracy to conceal it. The police witnesses testified, without contradiction, that the group in which appellant was standing began to scatter almost immediately after the warning was shouted, and that the gun was not thrown until after this occurred. This evidence does not support an inference that appellant and his companions entered into a conspiratorial agreement to conceal the gun before appellant threw it, because it is clear from the record that they dispersed before they had time to reach such an agreement. Indeed, it appears to us that the only inference a jury could reasonably draw from the evidence is that appellant threw the gun as an individual, spur-of-the-moment reaction to the approach of the police.

The only *specific* conduct on the part of appellant's companions that is evidenced in the record is that they scattered and ran upon learning that the police were nearby. This, however, is not a felony (see § 148, subd. (a)(1) [resisting a peace officer is a misdemeanor]), nor does respondent argue otherwise. Accordingly, there is insufficient evidence in the record to show specific felonious conduct by gang members that was distinct from appellant's possession of the gun, and appellant's felony conviction on count 2 must be reduced to a misdemeanor.[11]

### B. Sufficiency of Evidence to Support Gang Enhancement on Count 3

In count 3 of the information, appellant was charged with violating section 12021(c)(1) by possessing a firearm within 10 years after being convicted of a misdemeanor (specifically, a violation of section 422). Appellant does not challenge the sufficiency of the evidence to support his underlying conviction on count 3, but he does

---

[11] Count 5 charged appellant with participation in a criminal street gang, the substantive offense defined by section 186.22(a). The trial court treated count 5 as a lesser included offense of count 2, and instructed the jury not to return a verdict on count 5 if it found appellant guilty on count 2. The elevation of the charge in count 2 to a felony was based on the very same facts that comprised the entire charge pleaded in count 5. Given our conclusion that the prosecution failed to present sufficient evidence of these facts, retrial of appellant on count 5 is barred.

challenge the sufficiency of the evidence to support the jury's true finding on the gang enhancement allegation under section 186.22(b).

Section 12021(c), the statute under which appellant was convicted in count 3, is a so-called "wobbler" offense—i.e., one that can be punished either as a misdemeanor or as a felony. (See generally *Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 902 (*Robert L.*) [defining "wobbler"].) Section 186.22(b), the gang enhancement statute, provides that additional time shall be added to the sentence imposed on "any person who is convicted of a *felony* committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (Italics added.) Due to the reference to conviction of a felony in section 186.22(b), the gang enhancement statute can apply only if appellant's violation of section 12021(c) is sentenced as a felony.[12] In the present case, the trial judge stayed appellant's conviction on count 3 under section 654. For that reason, no determination has been made whether appellant's conviction on count 3 was a felony, thus enabling the gang enhancement statute to apply.

We will assume, for purposes of this opinion, that on remand to the trial court, appellant's violation of section 12021(c)(1) can be sentenced as a felony, which was how it was charged in the information. Accordingly, for the trial court's guidance in the event

---

[12] The information also pled a gang enhancement allegation as to count 2. We have reduced the underlying conviction on count 2 to a misdemeanor, however, so the gang enhancement provided for in section 186.22(b) no longer applies.

A separate subdivision, section 186.22, subdivision (d), sets forth a sentencing scheme applicable to "[a]ny person who is convicted of a public offense punishable as a felony or a misdemeanor, which is committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." The effect of this subdivision is to establishes an alternate penalty provision that applies to all felonies, misdemeanors, and "wobblers." (*Robert L.*, *supra*, 30 Cal.4th at pp. 899-902.) Section 186.22, subdivision (d) was not pleaded in the information in this case, and its application to count 3 here would preclude the application to the same count of a sentence enhancement under section 186.22, subdivision (b). (See *People v. Arroyas* (2002) 96 Cal.App.4th 1439, 1444-1445, 1448-1449.) Accordingly, we assume for purposes of this opinion that section 186.22, subdivision (d) does not apply in this case.

the court chooses that option, we discuss the merits of appellant's argument that the jury's true finding on the section 186.22(b) enhancement allegation is not supported by sufficient evidence.

In this regard, appellant argues in one part of his opening brief that the enhancement did not apply because "there was no evidence that appellant promoted, furthered, or assisted in felonious conduct by the gang . . . ." However, that fact is *not* an element of section 186.22(b), but rather of section 186.22(a). As the Supreme Court recently explained in *Rodriguez*, *supra*, 55 Cal.4th at page 1138, "[s]ection 186.22(a) and section 186.22(b)(1) strike at different things. The enhancement under section 186.22(b)(1) punishes gang-related conduct, i.e., felonies committed with the specific intent to benefit, further, or promote the gang. [Citation.] However, '[n]ot every crime committed by gang members is related to a gang.' [Citation.]" Thus, "the gang enhancement under section 186.22(b)(1) requires both that the felony be gang related and that the defendant act with a specific intent to promote, further, or assist the gang, . . . [thereby] provid[ing] a nexus to gang activity sufficient to alleviate due process concerns. [Citation.]" (*Id.* at p. 1139.)

Thus, as appellant acknowledges elsewhere in his opening brief, what the prosecution was required to prove in order to apply the section 186.22(b) enhancement to appellant's sentence on count 3 was that in possessing the gun, appellant acted (1) "for the benefit of, at the direction of, or in association with" the Oakdale Mob, and (2) with the "specific intent to promote, further, or assist in any criminal conduct by" the Oakdale Mob. (§ 186.22(b)(1); see *People v. Gardeley* (1996) 14 Cal.4th 605, 615-617 (*Gardeley*).) The jury was instructed accordingly, using CALCRIM No. 1401.

As evidence supporting the jury's true finding on the gang enhancement allegation, respondent cites Broberg's testimony regarding the incident on March 17, 2010, in which appellant was shot in a location within the Oakdale Mob's territory, and was later found in a car with Tukes. Respondent argues that the jury was entitled to infer from this incident that appellant's intent in possessing the gun was to enable members of the Oakdale Mob, including appellant, to protect themselves against rival gang members.

18

Broberg's hearsay testimony about the incident on March 17, 2010, however, along with much of his other testimony about appellant's connections with the Oakdale Mob, was admitted only as part of the basis for Broberg's opinions, and not for its truth. Thus, although the jury was entitled to hear this testimony as part of the basis for Broberg's opinions, it was not entitled to draw factual inferences based on the assumption that Broberg's description of the incident was substantively true. (See generally *People v. Hill* (2011) 191 Cal.App.4th 1104, 1127-1137; see also *Gardeley*, *supra*, 14 Cal.4th 605 [expert opinion testimony about the practices, culture, and habits of gangs is admissible in prosecutions under section 186.22].)

Thus, the question before us is whether Broberg's opinion testimony regarding the gang-related[13] nature of appellant's gun possession, as well as appellant's intent in possessing the gun, is sufficient, standing alone, to support the jury's true finding as to the gang enhancement. "We review claims of insufficient evidence by examining the entire record in the light most favorable to the judgment below. [Citation.] We review to determine if substantial evidence exists for a reasonable trier of fact to find the counts against the minor true beyond a reasonable doubt. [Citation.] Substantial evidence must be reasonable, credible, and of solid value. [Citation.] We also presume the existence of every fact the [trier of fact] could reasonably deduce from the evidence in support of its judgment. [Citation.]" (*In re Frank S.* (2006) 141 Cal.App.4th 1192, 1196 (*Frank S.*).)

In the present case, the record includes substantial evidence that appellant possessed the gun while congregating with a group of young men, several of whom were members or affiliates of the Oakdale Mob, within the Oakdale Mob's territory. This evidence, taken together with Broberg's opinion, is sufficient to sustain a finding that appellant's gun possession occurred, at a minimum, "in association with" the Oakdale Mob. (See, e.g., *People v. Ochoa* (2009) 179 Cal.App.4th 650, 661, fn. 7 [fact that

---

**13** We use the term "gang-related" here as a shorthand for the statutory requirement that the offense be committed "for the benefit of, at the direction of, or in association with" a street gang. (See *Gardeley*, *supra*, 14 Cal.4th at p. 622.)

defendant had fellow gang member in stolen vehicle with him would support finding that defendant acted in association with gang].)

In this regard, *Frank S.*, *supra*, 141 Cal.App.4th 1192, on which appellant relies, is distinguishable, because in that case, the minor was *alone*, and *not* in gang territory, when he was stopped by police and found to be in possession of a knife. (See *id.* at pp. 1195, 1199.) Thus, in the present case, the prosecution's evidence regarding the gang-related nature of appellant's possession of the gun did not suffer from the vice, condemned in *Frank S.*, of being "based solely upon [appellant's] criminal history and gang affiliations." (*Id.* at p. 1192.)

*Frank S.*, *supra*, 141 Cal.App.4th 1192, also addressed the issue of the sufficiency of expert testimony to prove the *intent* element of the gang enhancement statute. In that case, the court held that evidence of gang "membership *alone* does not prove a specific intent . . . to promote, further, or assist in criminal conduct by gang members. [Citation.]" (*Id*. at p. 1199, italics added.) Subsequently, however, our Supreme Court has clarified that " '[e]xpert opinion that particular criminal conduct benefited a gang' is not only permissible but *can be sufficient* to support [a] gang enhancement." (*People v. Vang* (2011) 52 Cal.4th 1038, 1048, italics added, quoting *People v. Albillar* (2010) 51 Cal.4th 47, 63.)

In any event, the present case is distinguishable from *Frank S.*, *supra*, 141 Cal.App.4th 1192, on the issue of intent. In *Frank S.*, no evidence other than the gang expert's opinion supported the finding that the minor possessed the knife with the requisite specific intent; or, as the court put it, "nothing besides weak inferences and hypotheticals show[ed] the minor had a gang-related purpose for the knife." (*Id.* at p. 1199.) In fact, the minor himself had told the officers at the time of his arrest that "he had been jumped two days prior and needed the knife for protection." (*Ibid.*) Here, unlike in *Frank S.*, appellant offered no innocent explanation for his possession of the gun, such as that it was for personal self-defense, or that he had found it and was going to turn it in.

20

Moreover, here, unlike in *Frank S.*, *supra*, 141 Cal.App.4th 1192, there was substantial evidence independent of the gang expert's testimony that corroborated the expert's opinion regarding appellant's intent. First, the forensic serologist testified that the gun carried DNA from more than one person. True, none of that DNA matched that of the other young men who were arrested along with appellant (i.e., Whitfield, Tukes, and Lowe). However, DNA samples were not taken from any of appellant's other companions, and it would not have been unreasonable for the jury to infer that the DNA came from one or more Oakdale Mob members other than those the police happened to arrest along with appellant. This inference, coupled with Broberg's opinion testimony that gang members shared guns, is sufficient to support a finding that appellant had already shared the gun with other members of the Oakdale Mob, and thus possessed it with the intent to benefit or further the gang's activities.

Second, appellant was involved in a number of prior incidents involving guns that also involved members of the Oakdale Mob. One such incident was in December 2009, when appellant, Brewer, Benjamin, and McGhee were detained together following a shooting at Skyline College, and a gun was found. Both Brewer and Benjamin were convicted of weapons charges arising out of that incident, and there was evidence their crimes were gang-related, as Brewer's sentence included gang conditions, and Benjamin pleaded guilty to a gang charge. Thus, there was evidence independent of Broberg's testimony that appellant had previously associated with gang members at a time when they were in possession of a gun.

Moreover, there was a far more substantial basis for Broberg's opinion regarding appellant's intent than was articulated by the gang expert in *Frank S.*, *supra*, 141 Cal.App.4th 1192. In addition to the Skyline College incident, Broberg based his opinion on a number of specific prior incidents in which appellant was seen in the company of Oakdale Mob members, and firearms or ammunition were involved. These prior incidents included one on March 17, 2009, in which appellant was stopped while riding in a car in the company of two other gang members, and was found to be suffering from a gunshot wound that he was reluctant to reveal to the police. On September 25, 2009,

21

appellant joined Oakdale Mob member Benjamin in threatening to shoot security guards stationed near the Oakdale Mob's territory if the guards kept "messing with" Oakdale Mob members. On April 17, 2010, police received a report that someone had been seen brandishing a gun from a car in which appellant and an Oakdale Mob member were riding. On April 24, 2010, while appellant was detained in a location within the Oakdale Mob territory along with several Oakdale Mob members, a cache of bullets was found nearby. Regarding this incident, Broberg explained that gang members often conceal weapons and ammunition within their territory, to be picked up when needed by members of the gang.

Given the extensive factual basis described by Broberg for his opinion about appellant's intent in possessing the gun, together with Broberg's opinion about the violent nature of the Oakdale Mob, we conclude that Broberg's opinion constituted sufficient evidence to support the jury's finding that appellant's possession of a gun, while in the company of some other gang members, was with the specific intent to benefit or further the gang's activities. Accordingly, if count 3 is punished as a felony, substantial evidence supports the imposition of an additional term under the gang enhancement statute.

### C. Sufficiency of Evidence to Support Count 6

The statute under which appellant was charged and convicted in count 6 was Health and Safety Code section 11370.1 (section 11370.1). Section 11370.1 provides that a person who "unlawfully possesses any amount of . . . a substance containing methamphetamine . . . while armed with a loaded, operable firearm is guilty of a felony . . . ." It is clear on the face of the statute that possession of "a substance containing methamphetamine" (or one of the other listed drugs[14]) is an element of the crime.

In the present case, the prosecution presented uncontroverted evidence, in the form of expert testimony, that the pill found in appellant's pocket contained a chemical that the

---

[14] Section 11370.1 also criminalizes being armed with a loaded, operable firearm while in unlawful possession of a substance containing cocaine base, cocaine, heroin, or phencyclidine. Of the drugs listed, only methamphetamine is at issue in this case.

expert identified (using its scientific name) as MDMA. MDMA is not methamphetamine, however, nor is it any of the other controlled substances expressly listed in section 11370.1. Thus, appellant now argues that in order to prove all of the elements of the offense, the prosecution had to present additional evidence: either that the pill was "a substance containing methamphetamine," or that the pill was a substance containing an analog of methamphetamine.[15] As appellant points out, the prosecution did not ask its expert to testify to either of these propositions. Thus, there is no direct evidence in the record that MDMA contains methamphetamine, or is an analog of methamphetamine, or contains an analog of methamphetamine. Appellant contends that as a result of the prosecution's failure to present such evidence, there is insufficient evidence to establish one element of the crime charged in count 6.

The California Supreme Court has pending before it the issue whether a defendant can properly be convicted of an offense involving a controlled substance if the substance at issue is MDMA or Ecstasy, and there is neither expert testimony nor a stipulation that MDMA/Ecstasy is a controlled substance or an analog of a controlled substance. (*People v. Davis*, review granted Jan. 11, 2012, S198434; see also *People v. Le*, review granted Dec. 21, 2011, S197493.) Pending guidance from the Supreme Court, we must reach our own conclusion on the issue, based on the statutory language and general principles of criminal law.

In a criminal case, "the 'Fifth Amendment right to due process and Sixth Amendment right to jury trial . . . require the prosecution to prove to a jury beyond a

---

[15] Under Health and Safety Code sections 11400 and 11401, a controlled substance analog "shall . . . be treated the same as the controlled substance . . . of which it is an analog" for the purposes of drug offenses defined in certain provisions of the Health and Safety Code, including section 11370.1. "[T]he term 'controlled substance analog' means either . . . [¶] (1) A substance the chemical structure of which is substantially similar to the chemical structure of a controlled substance . . . [or] [¶] (2) A substance which has, is represented as having, or is intended to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to, or greater than, the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance . . . ." (Health & Saf. Code, § 11401.)

23

reasonable doubt every element of a crime.' [Citations.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1208.) For example, in *People v. Wallace* (2009) 176 Cal.App.4th 1088, the defendant, who was required to register as a sex offender, was charged with failing to register a new address within five days after moving, and failing to register within five days after his birthday. Our colleagues in Division Three of this court held that under the applicable statutes, continued residency somewhere within California was an element of these offenses. Because the prosecution had not introduced any evidence that the defendant still resided somewhere in California on the relevant dates, the court reversed the defendant's convictions. (*Id.* at pp. 1100-1107.)

Similarly, in *U.S. v. Zepeda* (9th Cir. 2013) 705 F.3d 1052 (*Zepeda*), the prosecution was required, in order to establish a basis for federal jurisdiction, to prove that the defendant was a member of a federally recognized Indian tribe. The prosecution proved that the defendant was an enrolled member of an Indian tribe, but neglected to prove that the tribe in question was federally recognized. The Ninth Circuit reversed the conviction on the ground of insufficient evidence, even though the tribe could easily have been shown to be federally recognized, because the prosecution failed to make such a showing on the record at trial. (*Id.* at pp. 1060-1065.)

As a corollary to the requirement that the prosecution prove all elements of a crime beyond a reasonable doubt, "an instruction lightening the prosecution's burden of proof violates the accused's right to a jury trial. [Citations.]" (*People v. Hunter* (2011) 202 Cal.App.4th 261, 276.) For example, in *People v. Hunter*, *supra*, the defendant was charged with robbing several victims, using an object that appeared to be a gun. The jury was instructed, at the prosecution's request, that the victims' inability to testify positively that the object was a genuine gun, as opposed to a model or toy, did not create a reasonable doubt regarding the defendant's guilt. The court held that this instruction impermissibly lightened the prosecution's burden to prove beyond reasonable doubt that the defendant had used a gun. However, the court held the error was harmless, given the plethora of uncontroverted evidence that the gun was real.

24

Here, the instructions did not inform the jury that in order to convict appellant on count 6, it had to find that MDMA is a substance containing methamphetamine. Rather, the jury was instructed to convict appellant on count 6 if it found (along with the other elements of the crime) that appellant possessed "3,4 MDMA Methylenedioxymethamphetamine (Ecstasy), a controlled substance" while armed with the gun. In effect, the instruction lightened the prosecution's burden of proof, or partially directed a verdict, by requiring the jury to *assume* that MDMA is a substance containing methamphetamine, instead of requiring the jury to make a *finding* to that effect. (Cf. *People v. Flood* (1998) 18 Cal.4th 470, 491-492 [jury instructions relieving the prosecution of the burden of proving beyond a reasonable doubt each element of the charged offense violate the defendant's due process rights under the federal Constitution].) Moreover, because the error in the instruction was of constitutional dimension, appellant's argument was not forfeited by the failure of appellant's trial counsel to object. (See *People v. Hillhouse* (2002) 27 Cal.4th 469, 503; *People v. Flood*, *supra*, 18 Cal.4th at p. 482, fn. 7.)

On appeal, respondent attempts to supply evidence of the missing element of the crime, and cure the defect in the jury instruction, by asserting that MDMA is in fact a substance containing methamphetamine. In support of this proposition, respondent relies on chemical and toxicology treatises and a medical dictionary, as well as the presence of the term methamphetamine in the scientific name of MDMA. Respondent appears to contend that these references constitute adequate proof that MDMA contains methamphetamine, or is or contains an analog of methamphetamine.

Respondent does not contend, however, that there is any evidence in the record supporting this fact. Respondent also does not explain why, if the proposition was true, the prosecution did not simply elicit testimony to that effect from its expert. (See Evid. Code, § 412 ["If weaker and less satisfactory evidence is offered when it was within the power of the party to produce stronger and more satisfactory evidence, the evidence offered should be viewed with distrust"]; *Vallbona v. Springer* (1996) 43 Cal.App.4th 1525, 1537 [in assessing defendant's net worth for punitive damages purposes, jury could

25

properly view defendant's evidence of his liabilities with distrust, since it was within his power to produce stronger and more satisfactory evidence].)

In any event, we cannot affirm appellant's conviction based on the sources cited in respondent's brief on appeal. These sources were not presented to the trial court or to the jury, nor has respondent properly requested that we take judicial notice of them. (See Cal. Rules of Court, rule 8.809.) And even if we were to overlook these procedural defaults, we cannot affirm appellant's conviction based on our own judicial notice of facts the prosecution failed to prove at trial. (See *Zepeda*, *supra*, 705 F.3d at pp. 1064-1065 [" '[f]or a court . . . to take judicial notice of an adjudicative fact after a jury's discharge in a criminal case would cast the court in the role of a fact-finder and violate [the] defendant's Sixth Amendment right to trial by jury' . . . "].)

Moreover, unlike the fact involved in *Zepeda*, it is by no means clear that the fact at issue here is actually a proper subject of judicial notice. Evidence Code section 451, subdivision (f), requires us to take judicial notice of "[f]acts and propositions of generalized knowledge that are so universally known that they cannot reasonably be the subject of dispute." Evidence Code section 452, subdivision (h), permits us to take judicial notice of "[f]acts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy." Neither of these statutes, nor any other doctrine, permits us to

take judicial notice, for the first time on appeal, of a fact that is neither a matter of generalized knowledge nor readily verifiable.[16]

Nonetheless, under the circumstances of this case, we conclude the error was harmless beyond a reasonable doubt. (See *People v. Flood*, *supra*, 18 Cal.4th at pp. 502-503 [instructional error that omits element of offense or partially directs verdict is not reversible if harmless beyond a reasonable doubt]; accord, *People v. Mil* (2012) 53 Cal.4th 400, 409.) Appellant's position is essentially that the trial court should have instructed the jury that in order to convict appellant on count 6, it had to find that MDMA is a substance containing either methamphetamine or an analog of methamphetamine. Appellant never disputed the truth of this proposition at trial, and there was no evidence tending to disprove it. (Cf. *People v. Flood*, *supra*, 18 Cal.4th at pp 504-507.) Thus, if a proper instruction had been given, we have no doubt the jury would have drawn the logical and reasonable inference, based on the chemical name of MDMA, that it is a substance containing methamphetamine. Accordingly, neither the absence of any direct evidence of that fact, nor the error in the jury instruction, requires the reversal of appellant's conviction on count 6.

### D. Reduction of Court Security Fee

Appellant argues that even if his convictions are sustained on appeal, the court security fee imposed by the trial court pursuant to section 1465.8, subdivision (a)(1), must be reduced from a total of $160 to $120, due to the trial court's having vacated

---

[16] See, e.g., *Ford v. Pacific Gas & Electric Co.* (1997) 60 Cal.App.4th 696, 706 [declining to take judicial notice on appeal of scientific article supporting alleged connection between electric and magnetic fields and cancer, a subject which was "far from indisputable"]; *Whispering Pines Mobile Home Park, Ltd. v. City of Scotts Valley* (1986) 180 Cal.App.3d 152, 162 [declining to take judicial notice for the first time on appeal of the contents of certain treatises on appraisal practices, since "we have no way of knowing if they are indisputably accurate sources"]; *Comings v. State Bd. of Education* (1972) 23 Cal.App.3d 94, 101-102 [refusing to take judicial notice of alleged scientific principle gleaned from selected medical and statistical studies, to the effect that the use of marijuana causes no ill effects on the human body]; *Galloway v. Moreno* (1960) 183 Cal.App.2d 803, 808-809 [proper to refuse judicial notice of debatable statistical evidence regarding premature births].

appellant's conviction on count 1, leaving only three convictions (on counts 2, 3, and 6). Respondent concedes the issue. Upon resentencing, the trial court shall recalculate the court security fee based on appellant's remaining convictions.

## DISPOSITION

Appellant's conviction of a felony on count 2 is REVERSED. In all other respects, appellant's convictions are AFFIRMED. The matter is remanded for further proceedings consistent with this opinion, including: (1) a determination whether appellant's misdemeanor convictions on count 1 and/or count 2 can be reinstated, and if so, whether either or both of the reinstated conviction(s) should be stayed pursuant to section 654; (2) a determination whether appellant's conviction on count 3 will be treated as a felony or as a misdemeanor for sentencing purposes, and (3) resentencing, including recalculation of the applicable court security fee.

_____
RUVOLO, P. J.


We concur:


_____
RIVERA, J.


_____
HUMES, J.