Opinion
 

 CORRIGAN, J.
 

 Cynthia Jill Ford appeals after the trial court sustained a demurrer by Pacific Gas and Electric Company (PG&E) to her wrongful death action. Ford alleged her husband’s brain cancer had been caused by occupational exposure to electric and magnetic fields (EMF’s) emitted by PG&E’s powerlines and equipment. She contends the trial court erred in deciding that the Public Utilities Commission (PUC) has exclusive jurisdiction over the matters alleged in the complaint. We conclude the trial court correctly determined it lacked subject matter jurisdiction and affirm.
 

 Factual and Procedural Background
 

 In February 1995, Ford filed a wrongful death and products liability action, alleging PG&E had negligently failed to warn her spouse, Mark
 
 *700
 
 Callan, of the dangers of occupational exposure to EMF’s.
 
 [1]
 
 The complaint alleged Callan died in 1994 after being diagnosed with brain cancer resulting from his exposure to EMF’s during his work as a lineman and engineer between 1978 and 1993. PG&E filed a demurrer, asserting the superior court lacked jurisdiction under section 1759 of the Public Utilities Code to interfere with the PUC’s regulation of powerline EMF issues.
 
 [2]
 
 In May 1995, the trial court sustained the demurrer without leave to amend, concluding the PUC has jurisdiction under
 
 Waters
 
 v.
 
 Pacific Telephone Co.
 
 (1974) 12 Cal.3d 1 [114 Cal.Rptr. 753, 523 P.2d 1161]. The court also sustained objections to certain scientific evidence offered by plaintiffs, deeming it irrelevant. After an unsuccessful petition for a writ of mandate, Ford filed this appeal. We granted the parties’ joint motion to hold briefing ip abeyance until 60 days after the Supreme Court filed its decision in
 
 San Diego Gas & Electric Co.
 
 v.
 
 Superior Court
 
 (1996) 13 Cal.4th 893 [55 Cal.Rptr.2d 724, 920 P.2d 669]
 
 (Covalt).
 

 [3]
 

 Discussion
 

 Pursuant to the California Constitution, the PUC has broad authority to regulate utilities. (Cal. Const., art. XII, §§ 1-6;
 
 Covalt, supra,
 
 13 Cal.4th at pp. 914-915.) The Constitution also grants the Legislature “plenary power ... to confer additional authority and jurisdiction upon the commission . . . .” (Cal. Const., art. XII, § 5.) Thus, the Legislature has enacted the Public Utilities Act (§ 201 et seq.), authorizing the PUC to “supervise and regulate every public utility in the State” and to “do all things . . . which are necessary and convenient in the exercise of such power and jurisdiction.” (§ 701.) Pursuant to the act, judicial review is “narrow in both ‘manner and scope.’ ”
 
 (Covalt, supra,
 
 at p. 915.) Review of a PUC decision is available only by writ of review in the Supreme Court, which is generally limited to determining “ ‘whether the commission has regularly pursued its authority’ [citation] . . . .”
 
 {Ibid.)
 
 Section 1759, subdivision (a) further provides that “No court of this state, except the Supreme Court... to the extent specified in this article, shall have jurisdiction to review, reverse, correct, or annul any order or decision of the commission or to suspend or delay the execution or operation thereof, or to enjoin, restrain, or interfere with the commission in the performance of its official duties . . . .”
 

 A different chapter of the Public Utilities Act prescribes a wide variety of public remedies for utilities’ violations of commission decisions, as well as
 
 *701
 
 a supplementary private remedy in the form of an action for damages.
 
 (Covalt, supra,
 
 13 Cal.4th at p. 916.) Section 2106 authorizes “an action for damages brought by the injured party in superior or municipal court against any public utility that does any act prohibited—or omits to do any act required—‘by the Constitution, any law of this State, or any order or decision of the commission’ [citation].”
 
 (Covalt, supra,
 
 at p. 916.) In addressing the potential conflict between sections 1759 and 2106, the unanimous Supreme Court has limited section 2106 to “ ‘those situations in which an award of damages would not hinder or frustrate the commission’s declared supervisory and regulatory policies.’ ”
 
 (Covalt, supra,
 
 at pp. 917-918, quoting
 
 Waters
 
 v.
 
 Pacific Telephone Co., supra,
 
 12 Cal.3d at p. 4.) “Under the
 
 Waters
 
 rule, accordingly, an action for damages against a public utility pursuant to section 2106 is barred by section 1759 not only when an award of damages would directly contravene a specific order or decision of the commission, i.e., when it would ‘reverse, correct, or annul’ that order or decision, but also when an award of damages would simply have the effect of undermining a general supervisory or regulatory policy of the commission, i.e., when it would ‘hinder’ or ‘frustrate’ or ‘interfere with’ or ‘obstruct’ that policy.”
 
 (Covalt, supra,
 
 at p. 918, fn. omitted.)
 

 In
 
 Covalt,
 
 the plaintiffs contended their real property had diminished in value due to public fear of health-endangering EMF’s from nearby power-lines. (13 Cal.4th at pp. 910-914.)
 
 [4]
 
 The Supreme Court concluded their nuisance action would interfere with the PUC’s EMF policy and was therefore barred by section 1759. (13 Cal.4th at pp. 935, 939; see
 
 id.
 
 at p. 918.)
 

 The Supreme Court first determined that the PUC has authority to adopt a policy on whether EMF’s from powerlines constitute a public health risk and what action, if any, the utilities should take to minimize that risk.
 
 (Covalt, supra,
 
 13 Cal.4th at p. 923.) The court noted “. . . the commission has comprehensive jurisdiction over questions of public health and safety arising from utility operations” and “is generally authorized to require every public utility to ‘construct, maintain, and operate’ its ‘plant, system, equipment, [or] apparatus’ in such manner as to ‘safeguard the health and safety of its employees, . . . customers, and the public . . . .’ (§ 768.)”
 
 (Id.
 
 at p. 924, brackets and ellipses in original.) The court also noted the existence of detailed regulatory requirements for overhead electric line construction designed to “ ‘insure adequate service and secure safety’ to those who work on such lines and to ‘the public in general.’ [Citation.]”
 
 (Id.
 
 at p. 925.)
 

 The Supreme Court next concluded the PUC had exercised its authority to adopt an EMF policy for electric utility facilities and powerlines by issuing
 

 
 *702
 
 a decision in November 1993.
 
 (Covalt, supra,
 
 13 Cal.4th at pp. 926, 930.)
 
 [5]
 
 In reaching its decision, the PUC reviewed the report of its advisory panel (the consensus group) and an assessment of the scientific evidence provided by the State Department of Health Services (DHS), and concluded the studies did not show an EMF health hazard actually existed or a clear cause and effect relationship between utility operations and public health.
 
 (Re Potential Health Effects of Electric and Magnetic Fields of Utility Facilities
 
 (1993) 52 Cal.P.U.C.2d 1, 27;
 
 Covalt, supra,
 
 at p. 930.) Recognizing public concern and scientific uncertainty, however, the PUC established an EMF policy requiring that new and upgraded facilities adopt no-cost and low-cost steps to reduce or mitigate EMF’s. (52 Cal.P.U.C.2d at p. 29;
 
 Covalt, supra,
 
 at p. 931.) The PUC also indicated its intention to further investigate appropriate policy options regarding EMF’s at existing utility facilities. (52 Cal.P.U.C.2d at pp. 9-10, 29.)
 
 [6]
 
 The
 
 Covalt
 
 court recently pointed out that “. . . the commission is still actively pursuing the broad policy inquiry into the potential health effects of powerline [EMF’s] that it initiated in 1991 [citation] and that produced its interim policy decision of 1993 [citation].”
 
 (Covalt, supra,
 
 at p. 934.)
 

 The
 
 Covalt
 
 court concluded an award of damages in the plaintiffs’ nuisance action would interfere with the PUC’s policy on EMF’s because “the trier of fact would be required to find that reasonable persons viewing the matter objectively (1) would experience a substantial fear that [EMF’s] cause physical harm and (2) would deem the invasion so serious that it outweighs the social utility of [the utility’s] conduct. Such findings, however, would be inconsistent with the commission’s conclusion, reached after consulting with DHS, studying the reports of advisory groups and experts, and holding evidentiary hearings, that the available evidence does
 
 not
 
 support a reasonable belief that [EMF’s] present a substantial risk of physical harm, and that unless and until the evidence supports such a belief regulated utilities need take no action to reduce field levels from existing powerlines.”
 
 (Covalt, supra,
 
 13 Cal.4th at p. 939.)
 

 Ford’s complaint alleges PG&E’s powerlines emitted unreasonably dangerous levels of EMF’s, which PG&E knew or should have known were potentially hazardous to human health. It further alleges PG&E had a duty to
 
 *703
 
 warn or protect workers such as decedent, who contracted brain cancer and died as a result of EMF exposure. This theory is precluded by the Supreme Court’s reasoning in
 
 Covalt.
 
 “After reviewing the current scientific evidence the commission has determined that it is
 
 not
 
 sufficient at this time to establish that [EMF’s] are dangerous, and on that basis has adopted a detailed interim policy on the subject.... A superior court determination that essentially the same evidence
 
 is
 
 sufficient to answer the question and that such fields are in fact dangerous would plainly undermine and interfere with that policy.”
 
 (Covalt, supra,
 
 13 Cal.4th at p. 947, italics in original.)
 

 Conceding there is no California case on point to support her position, Ford cites a recent Florida decision rejecting a preemption argument in an EMF personal injury case.
 
 (Florida Power & Light Co.
 
 v.
 
 Glazer
 
 (Fla.Dist.Ct.App. 1996) 671 So.2d 211.) The Florida utility’s argument there, however, was based on a broad separation of powers theory. The Florida court of appeal did not address the effect of a specific legislative restriction on judicial jurisdiction such as that provided in section 1759. (See
 
 Florida Power & Light Co., supra,
 
 at pp. 213-214.) The other cases Ford cites are factually distinguishable and, in several instances, were so distinguished in
 
 Covalt, supra,
 
 13 Cal.4th at page 945, because those particular actions did not hinder or interfere with a broad regulatory policy of the PUC. (See
 
 Cellular Plus, Inc.
 
 v.
 
 Superior Court
 
 (1993) 14 Cal.App.4th 1224, 1243 [18 Cal.Rptr.2d 308] [plaintiffs alleged price-fixing by cellular telephone companies; PUC had approved rates solely on basis of reasonableness, which was not relevant to price-fixing claim];
 
 Stepak
 
 v.
 
 American Tel. & Tel. Co.
 
 (1986) 186 Cal.App.3d 633 [231 Cal.Rptr. 37] [minority stockholders claimed telephone utility breached fiduciary duties in connection with merger approved by PUC; PUC had no policy regarding protection of such interests];
 
 Pierce
 
 v.
 
 Pacific Gas & Electric Co.
 
 (1985) 166 Cal.App.3d 68, 77-78 [212 Cal.Rptr. 283, 60 A.L.R.4th 709] [homeowner injured by exploding transformer; PUC had not determined exploding transformers posed no public health risk].) Here, by contrast, a trial court judgment in favor of Ford would necessarily be inconsistent with the PUC’s position in its EMF policy. (See
 
 Covalt, supra,
 
 13 Cal.4th at p. 950.)
 

 Ford also contends
 
 Covalt
 
 is distinguishable and that her wrongful death action would not interfere with the PUC’s policy because decedent’s cancer had a lengthy latency period and his relevant EMF exposure occurred in the 1970’s and 1980’s, before the policy was adopted. A finding by the trier of fact, however, that PG&E should have known 10 to 20 years ago that EMF’s were dangerous would necessarily undermine or interfere with the PUC’s subsequent determination otherwise, as ultimately expressed in its 1993
 
 *704
 
 decision and order.
 
 [7]
 
 As the
 
 Covalt
 
 court held in rejecting another negligence argument, “. . . an award of damages on that theory would plainly undermine the commission’s policy by holding the utility liable for not doing what the commission has repeatedly determined that it and all similarly situated utilities were not required to do.” (13 Cal.4th at p. 950.)
 
 [8]
 

 Ford next argues the PUC’s 1993 policy does not apply to her claim because it (1) specifically regulates only new and upgraded utility facilities and (2) does not express an intention to bar private disputes alleging EMF injury. As the Supreme Court pointed out in
 
 Covalt,
 
 however, (1) the PUC continues to study EMF’s at existing facilities (13 Cal.4th at pp. 931, 934-935) and (2) it is the Legislature, not the PUC, that has preempted local court jurisdiction in section 1759 (13 Cal.4th at p. 944). Ford’s citation of negligence cases arising in other contexts cannot overcome the section 1759 bar here. Ford also claims
 
 Covalt
 
 is distinguishable because it was a nuisance action, whereas her claim is based on personal injury. Section 1759, however, makes no exception for personal injury actions. Moreover, Ford’s theory is arguably even more directly opposed to the PUC’s EMF policy, which finds no established threat to human health.
 
 [9]
 

 In her reply brief, Ford claims decedent should be exempted from the PUC’s 1993 policy because his exposure to EMF’s was occupational and not as a residential customer, ratepayer, or employee of PG&E. She argues decedent does not come within the categories specified in section 451, to
 
 *705
 
 which the PUC referred in its 1993 EMF policy.
 
 [10]
 
 (See 52 Cal.P.U.C.2d at pp. 8, 28.) We need not address arguments raised for the first time in a reply brief. (See
 
 American Drug Stores, Inc.
 
 v.
 
 Stroh
 
 (1992) 10 Cal.App.4th 1446, 1453 [13 Cal.Rptr.2d 432].) In any event, such a narrow reading of the statutory language would be strained and hypertechnical. We reject the suggestion that the Legislature intended to require public utilities to promote the health and safety of their patrons, employees, and the public, but to exclude from that protection the decedent and other persons who happen to be employed by third parties.
 
 [11]
 
 The scope of the 1993 EMF policy is broadly phrased in terms of public health. We decline to infer a special exemption for decedent here.
 
 [12]
 

 Ford also contends the trial court erred in refusing to take judicial notice of reports of recent scientific studies allegedly showing a positive association between occupational exposure to EMF’s and brain cancer. Ford states these studies were not published until 1995 and were therefore not considered by the PUC in its 1993 order. She argues the trial court’s ruling was prejudicial because the demurrer was sustained without leave to amend. However, she fails to demonstrate how she could amend the complaint to change the legal effect of her pleading. (See
 
 Hendy
 
 v.
 
 Losse
 
 (1991) 54 Cal.3d 723, 742 [1 Cal.Rptr.2d 543, 819 P.2d 1].) She apparently intends to rely on these studies to persuade the court that EMF’s are dangerous to human health. This strategy, however, is precluded by section 1759 and
 
 Covalt, supra,
 
 13 Cal.4th 893, in which the Supreme Court discussed the very studies on which Ford relies, concluding they had not changed the broad scientific consensus on which the PUC predicated its 1993 order. (13 Cal.4th at pp. 947-948.) Moreover, Ford does not explain how a study published in 1995 would be relevant to a determination of PG&E’s alleged negligence almost 20 years earlier. Thus, the denial of her motion for judicial notice could not have been prejudicial.
 
 *706
 
 Ford has also filed a motion to produce additional evidence on appeal, which includes a scientific article published in December 1995, after the trial court’s decision. She asks this court to take judicial notice of the article. The evidentiary provisions supporting judicial notice, however, refer to “[fjacts and propositions that are of such common knowledge . . . that they cannot reasonably be the subject of dispute” and “are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy.” (Evid. Code, §§ 452, subds. (g), (h), 459.) The connection between EMF’s and cancer that Ford seeks to establish is far from indisputable, as discussed above.
 
 [13]
 
 (See
 
 Comings
 
 v.
 
 State Bd. of Education
 
 (1972) 23 Cal.App.3d 94, 101-102 [100 Cal.Rptr. 73, 47 A.L.R.3d 742] [asserted harmlessness of marijuana controversial and therefore not subject to judicial notice]; cf.
 
 People
 
 v.
 
 MacLaird
 
 (1968) 264 Cal.App.2d 972, 975 [71 Cal.Rptr. 191] [general accuracy of radar devices commonly known and therefore proper subject of judicial notice];
 
 People
 
 v.
 
 Law
 
 (1974) 40 Cal.App.3d 69, 75, 84 [114 Cal.Rptr. 708] [judicial notice could be taken of scientific articles regarding accuracy of voice identification tests for foundational purposes; test results excluded because reliability not sufficiently established].)
 

 Ford also cites Code of Civil Procedure section 909 and California Rules of Court, rule 23(b), which permit the reviewing court to take additional evidence in appropriate cases. This is not such a case. By its own terms, Code of Civil Procedure section 909 applies only where trial by jury is not a matter of right or has been waived. Ford does not explain how she meets these requirements. Moreover, the theory in support of which she offers the study, namely that EMF’s are dangerous to human health, is foreclosed by section 1759 because such a determination would impermissibly interfere with the PUC’s EMF policy, as discussed above.
 
 [14]
 
 Ford’s motion to produce additional evidence on appeal is therefore denied. (See
 
 Tyrone
 
 v.
 
 Kelley
 
 (1973) 9 Cal.3d 1, 13 [106 Cal.Rptr. 761, 507 P.2d 65] [appellate courts’ authority under Cal. Rules of Court, rule 23 and Code Civ. Proc., § 909 should be exercised sparingly and only under exceptional circumstances];
 
 Jacobs
 
 v.
 
 State Bd. of Optometry
 
 (1978) 81 Cal.App.3d 1022, 1034 [147
 
 *707
 
 Cal.Rptr. 225] [Cal. Rules of Court, rule 23 establishes “extraordinary procedure to be used sparingly and only in a case clearly calling for it”];
 
 De Angeles
 
 v.
 
 Roos Bros., Inc.
 
 (1966) 244 Cal.App.2d 434, 443 [52 Cal.Rptr. 783] [power “to be exercised sparingly and only where the purpose of the new findings would constitute a basis for an affirmance of the judgment or a basis for reversal of the judgment with directions to the trial court to enter judgment for appellants”];
 
 Pack
 
 v.
 
 Vartanian
 
 (1965) 232 Cal.App.2d 466, 476-477 [42 Cal.Rptr. 729] [motion denied where proffered additional evidence, if received, would serve no useful purpose].)
 

 Finally, Ford contends the PUC does not have authority to award tort damages and, further, that to deny her a superior court forum would violate the constitutional separation of powers and deprive her of due process, equal protection, and her right to a jury trial. In enacting section 1759, however, the Legislature has exercised its plenary power conferred by article XII, section 5 of the California Constitution “to confer additional authority and jurisdiction upon the commission, [and] to establish the manner and scope of review of commission action in a court of record . . . .” (See
 
 Covalt, supra,
 
 13 Cal.4th at pp. 914-915.) The Supreme Court has recognized the propriety of the Legislature’s statutory scheme and the breadth of the powers vested thereby in the PUC, including the narrowly limited nature of judicial review of commission action.
 
 (Id.
 
 at pp. 914-918.)
 

 The Legislature has also provided a statutory scheme to resolve disputes before the PUC, including a formal complaint procedure. (See § 1702 et seq.) Ford may pursue her administrative remedies thereunder and may thereafter seek appellate review, if necessary. The fact that section 1759 precludes superior court jurisdiction of her complaint does not leave Ford without a legal remedy. (See
 
 Pacific Tel. & Tel. Co.
 
 v.
 
 Superior Court
 
 (1963) 60 Cal.2d 426, 430 [34 Cal.Rptr. 673, 386 P.2d 233] [plaintiff whose superior court action was foreclosed by section 1759 could seek recission of the PUC’s decision by complaint to agency];
 
 Dollar-A-Day Rent-A-Car Systems, Inc.
 
 v.
 
 Pacific Tel. & Tel. Co.
 
 (1972) 26 Cal.App.3d 454, 460 [102 Cal.Rptr. 651] [plaintiffs could file complaint with the PUC, whose decision is subject to review by Supreme Court].) Nor does administrative adjudication of a matter otherwise properly within the agency’s regulatory power violate the constitutional guarantee of a jury trial. (See
 
 McHugh
 
 v.
 
 Santa Monica Rent Control Bd.
 
 (1989) 49 Cal.3d 348, 380-381 [261 Cal.Rptr. 318, 777 P.2d 91].) Finally, Ford’s claim that section 1759 discriminates against claimants with a wrongful death case against a public utility is not supported by her citation to
 
 Pierce
 
 v.
 
 Pacific Gas & Electric Co., supra,
 
 166 Cal.App.3d 68. The plaintiffs in
 
 Pierce
 
 were not similarly situated, as explained in
 
 Covalt, supra,
 
 13 Cal.4th at page 945.
 

 
 *708
 

 Disposition
 

 The judgment is affirmed.
 

 Phelan, P. J., and Parrilli, J., concurred.
 

 Appellants’ petition for review by the Supreme Court was denied March 18, 1998. Chin, J., did not participate therein.
 

 [1]
 

 Ford filed the action individually, as successor in interest to the estate of Mark Callan, and as guardian ad litem for her minor children.
 

 [2]
 

 All further statutory references are to the Public Utilities Code, unless otherwise specified.
 

 [3]
 

 Amici curiae briefs in support of PG&E have also been filed by a group of scientists represented by the Atlantic Legal Foundation, by the Edison Electric Institute, the California Municipal Utilities Association, and by Southern California Edison Company et al.
 

 [4]
 

 On appeal, the plaintiffs in
 
 Covalt
 
 abandoned their personal injury claims and request for injunctive relief. (13 Cal.4th at p. 935 & fn. 25.)
 

 [5]
 

 The PUC decision and order carried the designation “interim” due to the continuing evolution of scientific evidence and lack of scientific consensus regarding the potential health effects of EMF’s.
 
 (Covalt, supra,
 
 13 Cal.4th at p. 930.)
 

 [6]
 

 The order also included provisions regarding development of industry design guidelines, measurement of EMFs in customers’ homes and workplaces, continuing involvement by interested parties, public educational programs, and further research.
 
 (Re Potential Health Effects of Electric and Magnetic Fields of Utility Facilities, supra, 52
 
 Cal.P.U.C.2d at pp. 12, 29-31.)
 

 [7]
 

 The PUC had earlier addressed the potential public health effects of EMF’s in 1981 and 1990 decisions as well as a 1989 report to the Legislature.
 
 (Covalt, supra,
 
 13 Cal.4th at pp. 926-928.)
 

 [8]
 

 Ford also attempts to distinguish
 
 Covalt
 
 on the grounds that her complaint does not seek injunctive relief. The
 
 Covalt
 
 plaintiffs, however, had abandoned that claim on appeal. (13 Cal.4th at p. 935, fn. 25.) Their claim for damages was nevertheless barred by section 1759. Ford also claims that retroactive application of the PUC’s 1993 policy would deny her constitutional rights to due process and a jury trial. It is not the PUC’s policy that bars her claims, however, but article XII, sections 1 through 6 of the California Constitution and section 1759, which were enacted before decedent’s injuries occurred.
 

 [9]
 

 In her reply brief, Ford relies on
 
 Calif. Oregon Power Co.
 
 v.
 
 Superior Court
 
 (1955) 45 Cal.2d 858, 871 [291 P.2d 455], in which the public utility attempted to enjoin the Attorney General’s lawsuit to abate a nuisance arising from the utility’s operation of dams on the Klamath River. As another court later pointed out, however, the PUC had not acted in
 
 Calif. Oregon Power Co. (City of Union City
 
 v.
 
 Southern Pac. Co.
 
 (1968) 261 Cal.App.2d 277, 281 [67 Cal.Rptr. 816].) Thus, there was no question of interfering with a particular PUC policy, and the
 
 Calif. Oregon Power Co.
 
 court did not address the jurisdictional effect of section 1759. (See
 
 Calif. Oregon Power Co., supra,
 
 at p. 870.) This case is different; superior court jurisdiction would interfere with the PUC’s EMF policy, as explained above. (See
 
 Friends of H Street
 
 v.
 
 City of Sacramento
 
 (1993) 20 Cal.App.4th 152, 165-166 [24 Cal.Rptr.2d 607].)
 

 [10]
 

 Section 451 requires public utilities to maintain service as necessary “to promote the safety, health, comfort, and convenience of its patrons, employees, and the public.”
 

 [11]
 

 We also note the consensus group convened by the PUC to advise it on EMF policy included representatives from two locals of the electrical workers’ union.
 
 (Re Potential Health Effects of Electric and Magnetic Fields of Utility Facilities, supra, 52
 
 Cal.P.U.C.2d at p. 32.) We decline to adopt Ford’s strained interpretation of a single finding of fact in the 1993 PUC order, which states: “The Commission has no authority over municipal utilities, manufacturers, other state agencies, or other individual organizations.”
 
 (Id.
 
 at p. 28.) Viewed in context, this statement refers to the PUC’s lack of authority over nonutility sources of EMF’s and its consequent deferral to DHS in this regard.
 
 (Id.
 
 at pp. 15, 28.) It does not exempt Ford’s decedent from the PUC’s EMF policy.
 

 [12]
 

 We likewise need not address the arguments developed for the first time in Ford’s reply brief concerning the allegedly differing standards of proof in PUC and superior court proceedings. In addition, we note that acceptance of those arguments would be inconsistent with the Supreme Court’s decision in
 
 Covalt.
 

 [13]
 

 Indeed, the very study proffered by Ford concludes that “. . . it is not possible to conclude that EMF is causally associated with the observed excess of brain cancer in workers employed in electrical occupations.”
 

 [14]
 

 As the Supreme Court stated in rejecting a similar offer of a recent scientific study in
 
 Covalt, supra,
 
 13 Cal.4th 893: “While interesting, the report of a single positive epidemiological study (or even a number of such studies) in 1995 has not changed the broad scientific consensus on which the commission predicated its policy decision in 1993: for example, in the same year (1995) at least three noteworthy expressions of that consensus reiterated the view that the scientific evidence is still insufficient to establish that [EMF’s] are a health hazard.”
 
 (Id.
 
 at p. 948.)