Filed 1/5/24 (review denied 5/1/24; reposted with Supreme Court order and statement)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>DEMETRIUS COLEMAN,<br><br>     Defendant and Appellant. | A165198<br><br><br>(Humboldt County<br>Super. Ct. No. CR2000055B) |

When a criminal defendant voluntarily takes the stand, his or her credibility is always at issue. A defense attorney's salient advice to a defendant to speak in his or her own voice when he or she testifies does not indicate bias or animus toward a defendant because of his or her race, ethnicity, or national origin. The California Racial Justice Act of 2020 (RJA) (Stats. 2020, ch. 317) is not violated when a testifying defendant follows his or her attorney's advice to speak authentically and in his or her normal manner, even if the result is that the defendant testifies using slang terms, a certain accent, or a certain linguistic style.

Defendant was convicted by a jury of first degree murder with special circumstances that the murder was intentional and perpetrated by means of discharging a firearm from a motor vehicle (Pen. Code, §§ 187, subd. (a), 190.2, subd. (a)(21))[1] and an enhancement for personally and intentionally

---

[1] All statutory references are to the Penal Code.

1

discharging a firearm causing great bodily injury or death. (§ 12022.53, subd. (d).) Defendant contends we should reverse his conviction because his trial counsel exhibited racial bias toward him in violation of the RJA by advising him to "use Ebonics, slang, and to sound ghetto," when he testified.[2] Defendant also contends the trial court erred in imposing two sentence enhancements and in imposing a parole revocation restitution fine after sentencing him to life without the possibility of parole. The People agree the parole revocation restitution fine should be stricken. We modify the judgment to correct the sentencing error acknowledged by both parties and affirm the judgment as modified.

## BACKGROUND

We summarize only the facts necessary to resolve the issues on appeal.

## I. *Prosecution Evidence*

Mariah A. was a friend of defendant's girlfriend, Alma A. Mariah A., Alma A. and defendant were involved in brokering illegal marijuana sales. On August 29, 2019, after a playdate with their children, Mariah A. and Alma A. drove together with their two children from Eureka to Rio Dell. Alma A. drove, and they followed defendant, who was driving a green Honda. Alma A. used Mariah A.'s cell phone to call defendant during the drive. Mariah A. heard defendant on speaker phone say, " 'Stay back. Stay back, Mamas. You know what to do.' "

Shortly after 6:00 p.m., Alma A. and Mariah A. arrived in Rio Dell and parked on a corner near Wildwood Avenue. Alma A. got out of the car. Mariah A. saw Alma A. grab something from under the car's hood, put it under her T-shirt, and walk away along the sidewalk, out of Mariah A.'s

---

[2] The arrest warrant and declaration in support of the arrest warrant identify the defendant in this case as a Black man.

2

sight.  Mariah A. stayed in the car.  Defendant pulled up next to Mariah A. and asked for the location of Alma A.  Mariah A. said she did not know. Defendant said " 'Oh, my God,' " and drove off.  Alma A. came running back to the car and got into the driver's seat.  Then Mariah A. heard "pop, pop, pop, pop three times."  Alma A. said, " 'Oh, shit.  Oh, shit,' " and drove off.

Δ The police responded to the scene of the shooting and found a man later identified as Johnny Renfro suffering from an apparent gunshot wound.  He died from the gunshot wound to his lower abdomen.

Δ Mariah A. asked to be dropped off at a market, where her brother worked, but Alma A. refused and said she needed Mariah A.'s phone to contact defendant.  Defendant called Mariah A.'s cell phone and spoke with Alma A.  Mariah A. heard Alma A. ask him for his location.  Defendant said he was on Main Street in Rio Dell, and he asked Alma A. where he should go. Defendant also said the back window of the Honda had been shot out. Alma A. gave defendant directions to a location off of Highway 36. Mariah A. asked Alma A. to let her out at a different market, which she did. Alma A. told Mariah A. not to say anything.

Δ Regina O. and Jovan I. testified pursuant to an immunity agreement with the district attorney.  They lived on farmland off of Highway 36 in Fortuna.  They met with defendant in Eureka on the day of the shooting, and he gave them a marijuana sample.  Later that evening, defendant came to their house in a green Honda.  He told them that he had been robbed by men who took "a bag with 20 units" and shot at him as he was driving away. Defendant initially said he was robbed at a Target store and then that he was robbed in an industrial area of Eureka.  Alma A. arrived at Regina O. and Jovan I.'s home about 15 minutes after defendant.  Alma A. asked for a vacuum to clean the glass out of the Honda.  Alma A. started to vacuum the

3

car.   Defendant asked if he could leave the Honda there, and Jovan I. agreed.   Before defendant and Alma A. left, defendant said to Regina O. and Jovan I., " 'If three people know a secret, it's best if two of them are dead.' " Regina O. understood his statement to be a threat and that she should not say anything.   Regina O. later asked her father to move the car off her property, and he did so.

Two witnesses testified to hearing gunshots and seeing a green two-door car drive by.[3]   They heard a man screaming for help, ran to help him and called the police.   One of the witnesses described the driver of the Honda as a dark-skinned male with very thick hair on top and dreadlocks that went down to his ears.   He did not see anyone else in the car, but he saw a woman walk by the passenger side of the car.

Two other witnesses saw a green Honda driving erratically about 6:30 p.m. toward the Highway 101 on-ramp.   They both described the car as having the back window broken and said that there was only one person in the car.   One witness testified she was "95 percent" certain that defendant was the driver of the Honda.   She described the driver as a male with a medium-dark complexion and curly hair that looked like dreadlocks.   The other witness who saw the car enter the Highway 101 on-ramp described the driver as a Black male in his mid-thirties with black dreadlocks to his shoulders.

After learning of the shooting and that the police were looking for a green Honda, Regina O.'s father contacted the police and told them the car was on his property.   The Honda was registered to Denise L., who was defendant's ex-wife.   Previously, in May 2019, a police officer in Arcata

---

[3] One of the witnesses stated he believed the car was a Honda Accord.

4

conducted a traffic stop on the Honda. Alma A. was driving, and defendant was a passenger.

In January 2020, defendant and Alma A. were arrested in North Dakota.

## II.   *Defense Evidence*

A woman who lived near the scene of the shooting testified that on August 29, 2019, she saw a green vehicle drive by and heard gunshots. The driver of the green car was a chubby male with a big, round face. A woman was in the rear passenger seat of the green car. She had a thinner face and longer hair. Both people in the green car were dark-skinned.

Defendant testified that he was working as a broker in the illegal marijuana business. He explained that as a broker, "[i]f you have a nice product, I bring the money." He earned "a dollar off each bag," which he explained meant $100 per pound of marijuana. Defendant had brokered marijuana deals with Regina O. and Jovan I., including million-dollar deals.

In August 2019, defendant was robbed in the parking lot of a Target store during a sale of 30 pounds of marijuana. After defendant became suspicious that the buyers had not paid in full, they struggled over the "totes" and someone put a gun to defendant's face. He told them to take the marijuana, some of which he got from Regina O. and Jovan I. Defendant told Regina O. and Jovan I. about the robbery, and he paid them back for what was stolen.

On August 29, 2019, defendant planned to meet with clients. He was "working [his] phones and trying to get things situated" because he had "money in town," which meant he had "clients in town ready to do what we do." He was at a park with Alma A., Mariah A., and their children. He had driven there in his green Honda. Alma A. had driven in a gray Jeep with

5

Mariah A. and the two children.   A man defendant knew only as "Dread," whom defendant described as a dark-skinned Jamaican man with dreadlocks down to his shoulders, met defendant at the park to pick up a sample of marijuana from defendant.   Dread took the bag of marijuana back to his car.

Alma A. and Mariah A. left with the children to go to a store. Defendant started his Honda, planning to follow them to the store.   As he was starting to drive off, "[two] trucks pull[ed] up" on him.   One was the same one that was involved in the prior robbery, at Target.   Three or four Black men with guns got out of the trucks and began grabbing the "totes" out of defendant's backseat.   Defendant recognized two of the men.   One, whom defendant knew as "Oliver," hit defendant on the side of his head with a black gun that went off.   Defendant struggled with Oliver for the gun.   Oliver dropped the gun on the ground.   The men ran back to their trucks and drove off.   Dread was still there while defendant was "being jacked," and he yelled at the men to stop.

Defendant picked up the gun and put it on his passenger seat.   He drove to the store to meet Alma A. and Mariah A.   While defendant was in the parking lot waiting for them, Dread called him and said he wanted the gun.   When defendant was driving away from the store, with Alma A. and Mariah A. following him, defendant saw Dread pull up in a truck driven by another man.   Defendant got out of his Honda, and Dread walked over and said he would drive the Honda.   Defendant got in the back passenger seat of the Honda because he thought the man driving the truck was also going to get in the Honda.   However, the other man did not get in the Honda.   Dread sped off, southbound on Highway 101.   Dread said, " 'I know who it was,' " and, " 'I'm about to go get the pounds back.' "   Defendant told him to stop and let him out.   He told Dread, " 'It's just weed.   I'll pay that shit back.' "

Dread said, " 'Nah.   Fuck that.' "   Defendant called Alma A. while they were driving to tell her where they were located.   Dread pointed the gun at defendant and told him, " 'Shut the fuck up.' "

Dread drove to Rio Dell.   He drove by "this kid" who was changing clothes near a car and then went around the block.   They passed the Jeep Alma A. had been driving, but only Mariah A. was in the car.   They drove past Alma A., and she threw a marijuana sample in the Honda.   Dread told defendant to shut up and get down, behind him.   Defendant squatted on the floor behind the driver seat.   Then defendant heard four shots and saw the shattering of the Honda's rear window.   Defendant called Alma A. because Dread was asking where to go.   Dread threw the gun in a river before turning north onto Highway 101.   Dread stopped at Highway 36 and got out of the car.   Dread was picked up in a truck by Oliver, who robbed defendant at the park, and another man.

Defendant drove to Regina O. and Jovan I.'s home and told Alma A. to meet him there.   He told Regina O. and Jovan I. that he was just robbed. Alma A. arrived, and Regina O. and Jovan I. vacuumed the Honda. Defendant denied saying to Regina O. and Jovan I., " 'If three people know a secret, it's best if two of them are dead.' "   Defendant and Alma A. stayed at Regina O. and Jovan I.'s for a "minute," which he explained means a couple of hours, and then they eventually left in the Jeep Alma A. was driving that day.

Defendant drove to the San Francisco Bay Area because he thought he would be safe there.   He got rid of his phones after the shooting.   One of them was malfunctioning.   He called Jovan I. and said, " 'I need some trash. I needed to take out the trash,' " which meant defendant "needed 10,000

pounds of trim." Defendant explained that "trim" can be distilled and turned into cannabis.

Defendant did not know the person Dread shot, but he had seen him before. Defendant learned that there was a warrant for his arrest, and he told people he was on the run because he was a potential suspect in a shooting. After being on the run for a few months, defendant went to see his mother in North Dakota, where he was eventually arrested. However, defendant's mother had died on August 31, 2019.

When defendant spoke to the police following his arrest, he told them about the robbery at Target, but he did not say he was robbed at the park on the day of the shooting. He denied he was the shooter, but he did not say there was someone else in the Honda with him.

## DISCUSSION

### I.   *Racial Justice Act*

Defendant argues that his conviction should be reversed because his attorney violated the RJA by exhibiting racial bias against him. Specifically, he asserts that his attorney advised him to "use Ebonics, slang, and to sound ghetto," when he testified and that by doing so she at least exhibited implicit bias toward him. The People argue defendant may not raise this issue for the first time on appeal. In supplemental briefing, defendant argues that recent amendments to the RJA that became effective on January 1, 2024, permit defendant to raise this issue on direct appeal.[4]

---

[4] By separate order filed this date, we deny defendant's petition for writ of habeas corpus (case No. A166656), which also alleges a violation of the RJA.

### A. Additional Facts

The jury returned its guilty verdict on November 10, 2020. On December 30, 2020, defendant made an oral *Marsden* motion to replace his appointed counsel.[5] He claimed ineffective assistance of counsel on multiple grounds, including that his attorney advised him "to speak Ubonics [*sic*] and sound ghetto" when he testified. She told him to "use my slang." When he asked her why he should do this, defendant's attorney said she did not want him to sound like someone he was not. Defendant felt that his counsel's advice was discriminatory against him.

Defense counsel responded to defendant's claim as follows: "He wanted, . . . or was concerned about, I guess, trying to speak in a different manner. My experience has been, in serious felony trials, including murder, that . . . the jury will be able to pick up on if someone's trying to speak in a way that's not authentic or genuine, and it produces very, very bad results. So . . . I told him . . . don't be anybody that he's not. 'Speak how you speak. They're going to be able to know if you're trying to fake it and . . . adopt a manner of speech that's not yourself.' [¶] . . . [¶] . . . It wasn't based in race at all. And at points I would redirect him and . . . question him, 'Well, what does that actually mean,' to explain it to the jury so nothing went over their head, for sure."

The trial court denied defendant's *Marsden* motion on all grounds and found that defendant did not demonstrate ineffective assistance of counsel. However, the trial court decided to appoint new counsel who could investigate a potential motion for new trial, including possibly based on ineffective assistance of counsel due to an alleged disagreement between

---

[5] *People v. Marsden* (1970) 2 Cal.3d 118.

defendant and his counsel as to whether he should testify.   When defendant further questioned the trial court if it was acceptable for a lawyer to advise a client "to sound ghetto right before he gets on the stand and testifies for his life," the trial court said, "I can understand an attorney telling someone . . . [¶] . . . [¶] . . . to be yourself."   The trial court then stated that new counsel could further explore the issue.

On December 30, 2021, defendant's new counsel filed a motion for new trial raising claims of ineffective assistance of counsel on other grounds, and other alleged bases for a new trial.   The motion did not assert ineffective assistance of counsel based on racial discrimination; nor did it assert a claim under the RJA.

On April 19, 2022, the trial court denied defendant's motion for new trial and proceeded with sentencing.   Although his motion for new trial did not raise claims of racial discrimination by his former counsel, defendant again stated at his sentencing that his prior attorney told him "to speak ebonese [*sic*], sound hood . . . and sound like a thug."

The trial court sentenced defendant to life without the possibility of parole, plus consecutive terms of 25 years to life for the firearm enhancement and five years for one prior serious felony conviction, and restitution fines and fees.

### B.    Legal Framework

The RJA became effective on January 1, 2021.   (§ 745, added by Stats. 2020, ch. 317, § 3.5.)   The Legislature enacted the RJA with the intent "to eliminate racial bias from California's criminal justice system" and "to ensure that race plays no role at all in seeking or obtaining convictions or in sentencing."   (Stats. 2020, ch. 317, § 2(i); see *Young v. Superior Court* (2022) 79 Cal.App.5th 138, 149–150.)   The goal of the RJA is "to provide remedies

10

that will eliminate racially discriminatory practices in the criminal justice system, in addition to intentional discrimination." (Stats. 2020, ch. 317, § 2(j).)

The RJA provides: "The state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin." (§ 745, subd. (a).) The RJA includes four categories of conduct, any one of which, if proven by a preponderance of the evidence, establishes a violation of the RJA. (§ 745, subd. (a)(1)–(4).) Pertinent to defendant's claims, it is a violation of the RJA if: "(1) [t]he judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin"; or "(2) [d]uring the defendant's trial, in court and during the proceedings, the judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror, used racially discriminatory language about the defendant's race, ethnicity, or national origin, or otherwise exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin, whether or not purposeful. This paragraph does not apply if the person speaking is relating language used by another that is relevant to the case or if the person speaking is giving a racially neutral and unbiased physical description of the suspect." (§ 745, subd. (a)(1) & (2).)

Prior to recent amendments, the procedures for seeking relief under the RJA were as follows: "A defendant may file a motion in the trial court or, if judgment has been imposed, may file a petition for writ of habeas corpus or a motion under Section 1473.7 in a court of competent jurisdiction, alleging a violation of subdivision (a)." (§ 745, former subd. (b).)

11

In supplemental briefing, defendant informs this court of the recent passage of Assembly Bill No. 1118 (2023–2024 Reg. Sess.) (Assembly Bill No. 1118), which became effective on January 1, 2024, and amended subdivision (b) of section 745 as follows: "A defendant may file a motion pursuant to this section, or a petition for writ of habeas corpus or a motion under Section 1473.7, in a court of competent jurisdiction, alleging a violation of subdivision (a). For claims based on the trial record, a defendant may raise a claim alleging violation of subdivision (a) on direct appeal from the conviction or sentence. The defendant may also move to stay the appeal and request remand to the superior court to file a motion pursuant to this section." (§ 745, subd. (b), amended by Stats. 2023, ch. 464, § 1, eff. Jan. 1, 2024.) Defendant asserts that the trial record establishes a violation of section 745 and that he may raise this issue on direct appeal.

## C.    Forfeiture

Although defendant complained during his *Marsden* hearing that he thought his defense counsel discriminated against him when she advised him "to speak Ubonics [*sic*] and sound ghetto" and to "use my slang" when he testified, neither defendant nor his substituted defense counsel raised an RJA claim before the trial court. The People argue defendant has forfeited his RJA claim.

In supplemental briefing, defendant asserts that the recent amendments to section 745, subdivision (b) expressly permit him to raise his claim for the first time on appeal because his claim is based on the trial court record. He further argues that the amendments, effective January 1, 2024, apply retroactively to him because his case will not yet be final by January 1, 2024. The People agree that the amendments in Assembly Bill No. 1118 apply to defendant because they will become effective before the decision in

12

this case is final. However, the People assert that the amendments do not excuse forfeiture here because defendant had the opportunity to present an RJA claim in the trial court and failed to do so.

We exercise our discretion to reach the merits of defendant's RJA claim and do not decide whether Assembly Bill No. 1118's amendments to section 745 excuse forfeiture. (*People v. Monroe* (2022) 85 Cal.App.5th 393, 400 [appellate court has authority to consider issue not preserved for review].)

### D. No RJA Violation

The Legislature's stated intent in enacting the RJA was " 'to eliminate racial bias from California's criminal justice system because racism in any form or amount, at any stage of a criminal trial, is intolerable, inimical to a fair criminal justice system, is a miscarriage of justice under article VI of the California Constitution, and violates the laws and Constitution of the State of California.' " (*People v. Simmons* (2023) 96 Cal.App.5th 323, 333, petn. for review filed Dec. 1, 2023, S282895, quoting Assem. Bill No. 2542 [(2019–2020 Reg. Sess.)], § 2, subd. (i).) We also acknowledge that the RJA may be violated by evidence of unintentional or implicit bias or animus toward a defendant based on the defendant's race, ethnicity, or national origin. (§ 745, subd. (a)(2).)

We recognize the extraordinary need to root out both explicit and implicit biases that infect the judicial system and that the RJA is an important tool to help achieve a more just judicial system. At the same time, we also recognize that determining what does and what does not constitute the exhibition of "bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin, whether or not purposeful," may be a difficult task. (§ 745, subd. (a)(2).) As explained *post*, we find that defendant has not carried his burden to demonstrate a violation of the RJA.

Defendant's claim is based on the record he developed at his *Marsden* hearing. He asserts that his attorney exhibited at least implicit bias toward him based on his race when she allegedly told him " 'to speak Ubonics [*sic*] and sound ghetto' " and to " 'use my slang.' " Thus, he contends, he has established by a preponderance of the evidence violations of the RJA under subdivision (a)(1) and (2) of section 745.[6]

Defendant argues that the record shows he testified in "a highly unusual and informal manner, repeatedly using slang, street vernacular, improper English, and other language inappropriate in any formal courtroom setting . . . ." He cites examples from the record highlighting his use of slang terms, such as: he would "[c]harge a dollar off each bag," which meant he received $100 for each pound of marijuana sold; he "smash[ed]" in his truck, which meant he had sex; and he repeatedly referred to " 'bags,' " " 'weed,' " and " 'totes.' " He further references his response, when asked about Regina O. and Jovan I.'s share of the proceeds from their marijuana deal, that he "wasn't worried about they cut because I wasn't concerned about what they got they cut for or what they got each the bag for or if it was theirs or—you know what I mean? I was just there to make that deal then worry about my people getting up out of there." (*Sic.*) Further, he cites to the answer he gave when he was asked if he understood Jovan I. to be Bulgarian.[7] Defendant responded that he did not know the difference

---

[6] Defendant has not moved to stay the appeal or requested remand to the trial court so that he may file a motion under section 745. (Stats. 2023, ch. 464.)

[7] Defendant previously testified to meeting Regina O. and Jovan I. "[t]hrough some other Bulgarians."

14

between Bulgarians, Serbians, and Russians and that "[i]n the gang where I'm at, we call them Bulgarians on the street . . . ."

We reviewed the entirety of defendant's testimony and find that he fully explained his version of the events that led up to the shooting. As defense counsel stated at the *Marsden* hearing, she redirected defendant at times to further explain his responses. Defense counsel also referenced the "lingo" defendant used with the farmers and buyers engaged in the illegal marijuana business. She questioned him about his use of slang terms such as "bag" and "dollar," and he clarified that when he said he makes a dollar off of each bag sold, he meant that he made $100 per pound of marijuana sold. Nothing about defendant's use of these terms or the manner of his overall testimony suggests that his attorney exhibited racial bias or animus toward him. In fact, it is not unusual for witnesses of any race to use slang terms in cases involving illegal drug dealing.

We reject defendant's contention that his own testimony amounts to a violation of the RJA because his attorney allegedly told him to "sound ghetto" and "use my slang." At the *Marsden* hearing, defendant acknowledged that when he questioned his counsel's advice on this point, she said "she didn't want me to sound like somebody I wasn't." Defense counsel corroborated that her advice to defendant was to " '[s]peak how you speak' " and not to adopt a different manner of speech in order to avoid appearing inauthentic before the jury. As the trial court found, in denying defendant's *Marsden* motion, defense counsel was not ineffective for advising defendant to "be yourself" when he testified.

When a defendant testifies in his or her own defense, his or her credibility is always at issue. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1139.) The record establishes that defense counsel had a valid tactical

15

reason for advising defendant not to change his manner of speaking. Counsel was not ineffective for recognizing the importance of defendant's appearing authentic and genuine when he testified before his jury. Arguably, there was a factual dispute as to the precise language used when defense counsel discussed defendant's manner of speaking in preparation for his testimony. However, the record on which defendant asks us to rule reflects that the trial court credited defense counsel's statement that she told defendant to "be yourself." It further reflects defendant's acknowledgment that defense counsel explained to him her concern that defendant should not sound like someone he was not. Even if we assume that in preparation for defendant's testimony defendant or defense counsel used slang terms regarding defendant's manner of speaking, when considered in the context of giving advice to testify authentically, we find no violation of the RJA. This record falls far short of meeting defendant's burden to demonstrate by a preponderance of the evidence that defense counsel's sound advice indicated racial animus or bias toward him. We conclude that a defense attorney's advice to a defendant to " '[s]peak how you speak' " when testifying, without more, does not indicate racial bias or animus sufficient to support a violation of the RJA.

## II.    *Senate Bill No. 81*

On April 19, 2022, the trial court sentenced defendant, in accordance with the recommendations of the probation report, to life without the possibility of parole for his murder conviction (§ 187, subd. (a); count 1) consecutive to 25 years to life for the firearm enhancement (§ 12022.53, subd. (d)) and five years for a prior serious felony (§ 667, subd. (a)(1)). He contends his case should be remanded for resentencing under amendments added to section 1385 by Senate Bill No. 81 (2021–2022 Reg. Sess.) (Senate Bill No.

81). Defendant claims in his opening brief that because multiple enhancements were alleged, subdivision (c)(2)(B) of section 1385 required the trial court to dismiss " 'all enhancements beyond a single enhancement' " and that subdivision (c)(2)(C) required the trial court to dismiss an enhancement that could result in a sentence of over 20 years.

The People argue defendant's claim is forfeited because he failed to request that any enhancements be stricken under section 1385.

In his reply brief, defendant does not address the People's forfeiture argument. Instead, defendant acknowledges that recent case law supports the People's argument that the trial court maintains discretion to impose sentencing enhancements under amended section 1385.[8] He then argues for the first time in his reply brief that the record does not indicate the trial court was aware of its discretion and, therefore, we should remand for resentencing. We agree with the People that defendant's claim that his enhancements should have been stricken is forfeited.

Effective January 1, 2022, Senate Bill No. 81 amended section 1385 to add subdivision (c), which states: "Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute." (§ 1385, subd. (c)(1), amended by Stats. 2021, ch. 721, § 1.) In exercising its discretion, "the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating

---

[8] See *People v. Mendoza* (2023) 88 Cal.App.5th 287, 290–293; *People v. Anderson* (2023) 88 Cal.App.5th 233, 238–240, review granted Apr. 19, 2023, S278786; *People v. Lipscomb* (2022) 87 Cal.App.5th 9, 15–21; *People v. Walker* (2022) 86 Cal.App.5th 386, 391, 395–398, review granted Mar. 22, 2023, S278309; *People v. Ortiz* (2023) 87 Cal.App.5th 1087, 1098, review granted Apr. 12, 2023, S278894.

17

circumstances in subparagraphs (A) to (I) are present.   Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety."   (§ 1385, subd. (c)(2).)   The two circumstances relevant here are:   "Multiple enhancements are alleged in a single case.   In this instance, all enhancements beyond a single enhancement shall be dismissed" (§ 1385, subd. (c)(2)(B)); and "[t]he application of an enhancement could result in a sentence of over 20 years. In this instance, the enhancement shall be dismissed."   (§ 1385, subd. (c)(2)(C).)

Defendant was sentenced on April 19, 2022, over four months after the effective date of Senate Bill No. 81.   Defendant offers no excuse for his failure to ask the trial court to strike his enhancements, and he does not respond to the People's forfeiture argument in his reply brief.   Instead, his reply brief admits he did not file a sentencing brief in the trial court and that neither Senate Bill No. 81 nor section 1385 was mentioned at the sentencing hearing.

Under section 1385, a defendant "ha[s] the right to 'invite the court to exercise its power by an application to strike a count or allegation of an accusatory pleading' . . . ."   (*People v. Carmony* (2004) 33 Cal.4th 367, 375.) However, "any failure on the part of a defendant to invite the court to dismiss under section 1385 . . . waives or forfeits his right to raise the issue on appeal."   (*Id.* at pp. 375–376.)   Defendant's claim is forfeited for failure to request that the trial court strike the enhancements under section 1385.

We further find that defendant forfeited his refashioned argument that a remand for resentencing is required because the record does not indicate the trial court was aware of its discretion under section 1385.   Defendant

raised this argument for the first time in his reply brief. (*Ford v. Pacific Gas & Electric Co.* (1997) 60 Cal.App.4th 696, 705 ["We need not address arguments raised for the first time in a reply brief"].) We also reject this argument on the merits. Defendant has not affirmatively demonstrated that the trial court was unaware of or misunderstood the scope of its sentencing discretion. He relies only on the fact that Senate Bill No. 81 and section 1385 were not mentioned during his sentencing hearing. However, Senate Bill No. 81's amendments to section 1385 became effective on January 1, 2022. Defendant's sentencing hearing was over four months later, on April 19, 2022. We assume the trial court was aware of and followed applicable law. (*People v. Stowell* (2003) 31 Cal.4th 1107, 1114.) Defendant's citation to a silent record is insufficient to meet his burden to demonstrate an abuse of discretion. (*People v. Czirban* (2021) 67 Cal.App.5th 1073, 1096–1097.)

Defendant's final argument is that the trial court erred in imposing a parole revocation restitution fine pursuant to section 1202.45 because his sentence of life without the possibility of parole does not include a period of parole. The People agree that the trial court improperly imposed the parole revocation restitution fine. Section 1202.45 provides in pertinent part: "In every case where a person is convicted of a crime and whose sentence includes a period of parole, the court shall . . . assess an additional parole revocation restitution fine . . . ." This additional parole revocation restitution fine "shall be suspended unless the person's parole . . . is revoked." (§ 1202.45, subds. (a), (c).) Where, as here, a defendant's sentence does not include a period of parole, section 1202.45 does not authorize imposition of a parole revocation restitution fine. (*People v. Jenkins* (2006) 140 Cal.App.4th

19

805, 819.) Accordingly, the abstract of judgment must be modified to strike the parole revocation restitution fine.

## DISPOSITION

The judgment is modified to strike the parole revocation restitution fine. The trial court is directed to prepare an amended abstract of judgment striking the parole revocation restitution fine and to forward a copy to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.


Jackson, P. J.


WE CONCUR:

Burns, J.
Chou, J.


A165198/*People v. Demetrius Coleman*

20

A165198/People v. Demetrius Coleman

Trial Court:         Superior Court of Humboldt County

Trial Judge:        Kelly L. Neel

Counsel:            Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant.

                    Rob Bonta, Attorney General, Lance E. Winters and Jeffrey M. Laurence, Assistant Attorneys General, Catherine A. Rivlin and Allen R. Crown, Deputy Attorneys General, for Plaintiff and Respondent.

Court of Appeal, First Appellate District, Division Five - No. A165198

**S283717**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

_____

THE PEOPLE, Plaintiff and Respondent,

v.

DEMETRIUS COLEMAN, Defendant and Appellant.

_____

The petition for review is denied.


(See Concurring Statement by Justice Evans)


_____/s/_____
*Chief Justice*

PEOPLE v. COLEMAN

S283717


Concurring Statement by Justice Evans


I agree with my colleagues that this is not an appropriate case in which to grant review.  I write separately, however, to discuss the proper inquiry under the California Racial Justice Act of 2020 (RJA) (Stats. 2020, ch. 317) when a defendant alleges discrimination by their attorney.

Defendant Demetrius Coleman testified in his own defense at his trial for special circumstance murder in 2020. Following his testimony, Coleman brought a *Marsden* motion (*People v. Marsden* (1970) 2 Cal.3d 118) in the trial court to replace his appointed counsel.  Coleman, a Black man, claimed his counsel discriminated against him by advising him to "speak [E]bonics," "sound ghetto," and "talk hood" when he testified.  In response, trial counsel did not deny Coleman's claims but explained she was advising him to testify authentically and " '[s]peak how you speak.' "  On December 30, 2020, the trial court denied the *Marsden* motion, finding Coleman failed to demonstrate his counsel rendered ineffective assistance.  The court appointed new counsel to explore a potential motion for a new trial based on another ground of ineffective assistance.  After its ruling, Coleman asked the trial court if it was acceptable for counsel to advise their client "to sound ghetto right before he gets on the stand and testifies for his life."  The trial court responded:  "I can understand an attorney telling someone . . . [¶] . . . [¶] to be yourself."  The court stated new counsel could further explore that issue

1

"whether or not which words were used." Ultimately, Coleman's new counsel did not raise any claim relating to counsel's advisements regarding Coleman's testimony. At sentencing, in April 2022, Coleman again told the trial court that his prior counsel had advised him "to speak ebonese [*sic*], sound hood . . . and sound like a thug." The trial court sentenced Coleman to life without the possibility of parole, along with additional determinate terms.

The Legislature enacted the RJA "to eliminate racial bias from California's criminal justice system." (Stats. 2020, ch. 317, § 2(i).) The Legislature pronounced that "racism in any form or amount, at any stage of a criminal trial, is intolerable, inimical to a fair criminal justice system, is a miscarriage of justice under article VI of the California Constitution, and violates the laws and Constitution of the State of California." (*Ibid.*) As relevant here, an RJA violation occurs when specific actors, including counsel, exhibit racial bias — explicit or implicit. (Pen. Code, § 745, subd. (a)(1) & (2).) "Implicit bias, although often unintentional and unconscious, may inject racism and unfairness into proceedings similar to intentional bias." (Stats. 2020, ch. 317, § 2(i).) When an RJA violation occurs, the court *shall* impose an appropriate remedy. (Pen. Code, § 745, subd. (e).)

In rejecting his RJA claim, the Court of Appeal focused on Coleman's testimony and concluded "[n]othing about defendant's use of [slang] terms or the manner of his overall testimony suggests that his attorney exhibited racial bias or animus toward him." (*People v. Coleman* (2024) 98 Cal.App.5th 709, 722 (*Coleman*).) The Court of Appeal also opined that counsel did not render ineffective assistance of

counsel — which requires a showing of prejudice — because she had a tactical reason for advising Coleman to not change the way in which he spoke. (*Ibid.*) The Court of Appeal's analysis suggests that establishing an RJA violation hinges on whether a defendant can demonstrate the alleged bias constituted ineffective assistance of counsel or otherwise had a tangible or prejudicial impact on the proceeding. Given the need for guidance, I write separately to underscore the proper inquiry in determining whether an RJA violation occurred when a defendant alleges bias by their attorney.

The RJA requires a court to determine whether there was an exhibition of racial bias or animus against the defendant. In this case, the question is whether counsel's advisements to Coleman regarding the manner in which he should testify violate the RJA. Coleman argues the record establishes his counsel advised him to "sound ghetto," "sound hood," and "sound like a thug," and such advisements reflect racial bias, in violation of the RJA. The Court of Appeal emphasized the record "reflects that the trial court credited defense counsel's statement that she told [Coleman] to 'be yourself.'" (*Coleman, supra*, 98 Cal.App.5th at p. 722.) It further opined: "Even if we assume that in preparation for defendant's testimony defendant or defense counsel used slang terms regarding defendant's manner of speaking, when considered in the context of giving advice to testify authentically, we find no violation of the RJA." (*Ibid.*)

Advisements to "sound ghetto," "sound hood," and "sound like a thug" are wholly different from general advice that one should testify authentically. These specific terms have deeply racialized and pejorative meanings that are widely known. They are laden with negative stereotypes including

associations with heightened criminality, violence, and reduced humanity. In my view, these particular advisements, standing alone, would be sufficient to infer Coleman's counsel exhibited at least implicit bias. However, it is unclear from the record whether counsel advised Coleman in this exact manner. As the Court of Appeal noted, Coleman did not move for a stay and remand to the trial court for further proceedings. (See Pen. Code, § 745, subd. (b).) Had he done so, the trial court could have conducted an evidentiary hearing to determine if counsel specifically advised Coleman to "sound ghetto," "sound hood," and "sound like a thug." (See Pen. Code, § 745, subd. (c).) An evidentiary hearing would have also presented Coleman with an opportunity to introduce any additional evidence, such as social science research or expert testimony, to demonstrate such statements evince racial bias.[1] (See Pen. Code, § 745, subd. (c)(2).)

In my view, the trial court should have conducted further inquiry into Coleman's allegations. While the RJA technically became effective two days after the trial court's *Marsden* ruling, the court could have asked counsel whether she made the specific statements Coleman alleged when considering the *Marsden* motion or afterwards when Coleman asked the court whether the alleged comments by counsel were acceptable. Had Coleman made his *Marsden* motion two days later, when the RJA became effective, it would have been appropriate —

---

[1]    Coleman filed a petition for a writ of habeas corpus — which provides another avenue for obtaining an evidentiary hearing relating to an RJA claim (see Pen. Code, § 745, subd. (b)) — in the Court of Appeal. The Court of Appeal summarily denied his habeas petition. Coleman did not file a petition for review before this court challenging that summary denial.

perhaps even required — for the court to construe his motion and argument as raising an RJA claim. (See Pen. Code, § 745, subd. (b) ["a defendant *may* file a motion . . . alleging a violation of subdivision (a)" (italics added)].) And when Coleman once again brought up the issue at his sentencing hearing in 2022, the trial court certainly could have inquired further into his allegations. The court's failure to do so appears to offend the RJA's demand that courts be scrupulous in examining concerns like the ones Coleman repeatedly raised here. The RJA was enacted because "[e]ven though racial bias is widely acknowledged as intolerable in our criminal justice system, it nevertheless persists because courts generally only address racial bias in its most extreme and blatant forms." (Stats. 2020, ch. 317, § 2(c).) In enacting the RJA, the Legislature acknowledged "all persons possess implicit biases [citation], . . . these biases impact the criminal justice system [citation], . . . [and] negative implicit biases tend to disfavor people of color." (Stats. 2020, ch. 317, § 2(g); see also *id.*, § 2(i).) The RJA contemplates the possibility of violations from varied actors in the legal system; neither defense counsel nor the courts are exempt. (See, e.g., Pen. Code, § 745, subd. (a)(1)–(2).) Whether or not Coleman's defense was prejudiced by counsel's guidance, public confidence in our legal system depends on identifying and eliminating racial bias, however subtle, wherever it appears.

In light of the underdeveloped record, I do not vote to grant review. Nevertheless, the question remains whether Coleman could have established an RJA violation had the trial court conducted a more probing inquiry into his claims. If Coleman's counsel actually advised him in the manner he alleges, it appears the answer is yes as such advisements

reflect racial bias that the RJA was designed to uproot, to ensure racial discrimination — in all its forms — is eradicated from our criminal justice system.


**EVANS, J.**

**I Concur:**

**LIU, J.**